## COMMONWEALTH vs. DONNA WOLCOTT.

No. 08-P-1047.

Hampden. December 10, 2009. - August 25, 2010.

Present: MILLS, KATZMANN, & FECTEAU, JJ.

*Homicide. Solicitation to Commit Felony. Practice, Criminal,* Public trial, Instructions to jury, New trial. *Constitutional Law,* Public trial. *Accessory and Principal. Evidence,* Prior misconduct, Admissions and confessions, Voluntariness of statement.

In a criminal case, the trial judge's on-the-record refusal to allow any members of the public to enter the courtroom during jury empanelment proceedings constituted a full closure of the courtroom, in contravention of the defendant's right to a public trial under the Sixth Amendment to the United States Constitution, where the judge did not consider alternatives to excluding the defendant's family and other members of the public. [461-465]

At the trial of indictments charging, inter alia, solicitation to commit murder, the judge properly instructed the jury that the defendant could be convicted based on a finding that the defendant solicited another person and intended that the person solicited commit the murder by procuring someone else to commit the act, where, given that there is no legal distinction between someone who commits a murder as an accessory as opposed to a principal, it is of no consequence whether the defendant solicited someone to personally kill the victim or to find another to do so. [465-469]

At the trial of indictments charging, inter alia, solicitation to commit murder, there was no error in the admission in evidence of testimony about a conversation the defendant had with another person in which the defendant stated that she needed help from the other person's husband in getting "rid of a problem," where the evidence did not constitute impermissible prior bad act evidence but, rather, was relevant to show the defendant's plan, intent, and motive to find someone who would kill her husband, and where the judge gave the jury a strong limiting instruction immediately after the testimony and repeated it in his final charge. [469]

A Superior Court judge properly denied a criminal defendant's motion to suppress portions of a signed statement given to police, on the ground that portions of her interview were not electronically recorded, where the judge correctly determined that the video recorder malfunction that caused a gap in the videotape of the interview was accidental; where, in the totality of the circumstances, the judge properly could have found that the defendant's statement was voluntary, given that the defendant reviewed and endorsed the entire written statement after its creation, including making changes to it; and where the judge correctly determined that at trial, a jury instruction would be the appropriate remedy. [469-473]

INDICTMENTS found and returned in the Superior Court Department on June 21, 2006.

A pretrial motion to suppress evidence was heard by *Tina S. Page*, J.; the cases were tried before *C. Jeffrey Kinder*, J., and a motion for a new trial, filed on August 14, 2008, was heard by him.

*Michael J. Fellows* for the defendant.

*Marcia B. Julian*, Assistant District Attorney, for the Commonwealth.

KATZMANN, J. The defendant, Donna Wolcott, appeals her convictions by a Superior Court jury for solicitation to commit a felony (murder), and two violations of abuse prevention orders. Informed by recent United States Supreme Court and Supreme Judicial Court decisions not available to the careful Superior Court judge, we reverse the order denying the motion for new trial on the grounds that an unconstitutional closure of the courtroom took place. In light of the remand to Superior Court, we address and uphold the judge's solicitation instruction, and various evidentiary rulings.

*Background.* We summarize the facts that the jury could have found as follows, and reserve the recitation of certain facts relevant to the discussion below. In March, 2006, Donna Wolcott told a number of people that she had grown unhappy in her marriage. Beyond that, she also asked a coworker, Jill Scibelli, whether her husband had contacts with the "Scibelli" crime family and said that she was "nervous" but "had money" and needed to get rid of a "problem."

On a Saturday in March, 2006, the defendant confided in her cousin, John Jamroz, that she wanted her husband to "just disappear" and asked him if he knew of anyone who could help her with the situation. After she called him again that Sunday, Jamroz contacted the defendant's sister, Holly Woods, and eventually, the State police.

On Monday, March 13, 2006, Jamroz spoke to the police and provided a written statement concerning the conversation. In the presence of the police, Jamroz called the defendant. She did not answer and Jamroz left a message. Later, the defendant returned Jamroz's call and left a message on his voice mail, stating that everything was "okay." Jamroz then called the defendant later that evening and she reiterated that things were "okay."

At some point between March 13, 2006, and March 20, 2006, Carol Sherman, a cousin of both the defendant and Jamroz, requested that Jamroz call the defendant so that she could tell him what to say to the police. Jamroz again contacted the State police on March 20, 2006. After speaking to the troopers, he drove to the barracks and gave another written statement. Jamroz then agreed to make another call to the defendant to see if she still wanted to go ahead with the plan to get rid of her husband. The troopers accompanied Jamroz to his home and Jamroz called the defendant. When the defendant did not answer, Jamroz left a message regarding the subject. Trooper Fitzgerald gave Jamroz his cellular telephone number and instructed Jamroz to call him when the defendant returned his call.

The next day, March 21, 2006, Trooper Fitzgerald received a call from Jamroz stating that the defendant had said she was working out her problems. In response, the troopers visited the home of the defendant and her husband. The defendant was asked by the police to accompany them to the station, where she was questioned and eventually arrested and indicted.[1]

Soon thereafter, the defendant's husband obtained a restraining order forbidding the defendant from calling the house except to speak about the children. The husband testified that she called the house twice from prison, but only to ask him to drop the restraining order.

On June 29, 2007, after a four-day jury trial, the defendant was convicted of one count of solicitation to commit murder and two counts of violating a restraining order.

*Discussion.* On appeal, the defendant seeks review of (1) the denial of her motion for a new trial for deprivation of her right to a public trial, (2) whether the trial judge's jury instruction improperly altered the common law crime of solicitation to commit murder, (3) whether a prior incriminating statement should have been excluded as improper prior bad act evidence, and (4) whether the defendant's signed statement should have been excluded because there were gaps in the recording of the three-hour interview that formed the basis for the statement.

1. *Public trial.* a. *Background.* Jury selection began on June 25, 2007. The venire were brought into the courtroom and the public was asked to step outside. During the jury selection

---

[1] See discussion *infra.*

process, after twenty-four jurors had been interviewed at sidebar, this exchange took place:

> DEFENSE COUNSEL: "Judge, there were people, family members and members of the public, I think, who would like to be able to be in the court room only there wasn't enough room, but now there is enough room and this is supposed to be a public proceeding, so if they could come in."

> THE COURT: "Have they been ordered excluded?"

> DEFENSE COUNSEL: "Well, there was no place for them. It is not that they were ordered excluded, there is no place to sit."

> THE COURT: "As soon as we have room."

> THE CLERK: "We need to move people out of the jury box."

> THE COURT: "When we have moved, when we have room, we'll allow them to come in."

The jury voir dire then continued until the lunch recess.

After the lunch recess, defense counsel orally moved for a mistrial on the grounds that the defendant was denied a public trial as provided under the Sixth Amendment to the United States Constitution. The oral motion was denied by the trial judge without any findings.

The next day, the second day of trial, the judge sua sponte raised the defendant's prior motion for a mistrial. The judge stated that the courtroom was small and could not accommodate the family members, and "[i]t was for that reason, and that reason alone, that some members of the defendant's family, perhaps, were asked to remain outside because there was simply not room for them."

After the trial, the defendant filed a motion for new trial and submitted the affidavits of Carol Sturm, Ruth Farnsworth, and Michael J. Fellows.[2] At a hearing on the motion, Sturm testified

---

[2]Sturm, the defendant's mother, stated in her affidavit that she was asked to

for the defendant that after being asked to leave, she sought reentry but was denied access. Court Officer Antonio Pires, who was in charge of the jury selection process, testified that "consistent with his usual policy, he asked the spectators if they would mind leaving the [court room] during jury selection, so that there would be sufficient room for all of the prospective jurors to sit. He denied that he ordered any spectators to exit the court room."

The judge credited the testimony of Officer Pires and discredited Sturm's. He denied the motion for new trial, concluding that there was no "closure" of the courtroom because "spectators agreed to leave the [court room] during jury selection, after having been asked by Officer Pires. They were not forced from the courtroom. Nor did members of the public make an effort to enter during the jury selection process. Had they done so, entry would have been permitted."

b. *Sixth Amendment right to public trial.* i. *Closure.* As provided in the Sixth Amendment to the United States Constitution, "[i]n all criminal prosecutions, 'the accused shall enjoy the right to a speedy and public trial . . . .' '[W]ithout exception, all courts have held that an accused is at the very least entitled to have [her] friends, relatives and counsel present . . . .' " *Commonwealth* v. *Marshall,* 356 Mass. 432, 435 (1969), quoting from *In re Oliver,* 333 U.S. 257, 271-272 (1948). See *Commonwealth* v. *Cohen (No. 1),* 456 Mass. 94, 106 (2010) (partial closure of courtroom contravened defendant's right to a public trial). "The guarantees of open public proceedings in criminal trials cover proceedings for the voir dire examination of potential jurors concerning their qualifications to serve." *Commonwealth* v. *Gordon,* 422 Mass. 816, 823 (1996). See *Presley* v. *Georgia,* 130 S.Ct. 721, 723-724 (2010); *Commonwealth* v. *Cohen (No. 1), supra* at 106.[3] See generally *ABC, Inc.* v. *Stewart,* 360 F.3d 90 (2d Cir. 2004).

---

leave the courtroom until jury selection was complete. Farnsworth stated in her affidavit that a court officer blocked her way into the courtroom during jury selection, and she witnessed Sturm and a reporter, Buffy Spencer, being excluded. Fellows, the defendant's attorney, stated that Spencer informed him that she was denied entry to the courtroom.

[3]Both *Commonwealth* v. *Cohen (No. 1), supra,* and *Presley* v. *Georgia, supra,* were decided after the proceedings under review here, and were thus not available to the judge.

A Sixth Amendment claim for denial of a public trial requires, as a preliminary matter, that the courtroom is closed to the public. See *Commonwealth* v. *Dykens*, 438 Mass. 827, 835-836 (2003). Although "a court room may be closed in the constitutional sense without an express judicial order," *Commonwealth* v. *Cohen (No. 1)*, *supra* at 108, at a minimum, "some affirmative act by the trial court meant to exclude persons from the courtroom" is required. *Ibid.*, quoting from *United States* v. *Al-Smadi*, 15 F.3d 153, 154 (10th Cir. 1994). See *Walton* v. *Briley*, 361 F.3d 431, 433 (7th Cir. 2004) ("Whether the closure was intentional or inadvertent is constitutionally irrelevant").

Here, while the judge made an after-the-fact finding that no closure occurred because nobody sought reentry into the courtroom, we conclude otherwise. The transcript reflects that defense counsel sought entry for the public by requesting that the judge allow members of the public to enter the courtroom for jury selection. The judge denied that request, stating that as seats became available, the public could take those seats. Defense counsel then moved for a mistrial, which the judge denied. While "the judge or court officers need not undertake an affirmative effort to seek out spectators when the departure of prospective jurors frees up seats[, . . .] if space in the court room is or becomes available, the judge must make sure that members of the public who wish to observe the proceedings are not prevented from doing so." *Commonwealth* v. *Cohen (No. 1)*, *supra* at 114. Compare *id.* (sign reading "Jury selection in Progress. Do Not Enter"). Here, the judge did not "announce at the outset that, because of space limitations, it is not possible immediately to accommodate members of the public, but that individuals who wish to observe empanelment proceedings will be permitted to enter the court room as space becomes available." *Id.* at 114 n.30. The judge's on-the-record refusal to allow any members of the public to enter the courtroom — and the findings that the court officer asked all members of the public to leave the courtroom, that members of the public remained outside of the courtroom during jury selection, and the absence of any evidence that these spectators were informed that they could reenter the courtroom as seats became available — constituted a closure triggering the protections of the Sixth Amendment. See *State* v. *Torres*, 844 A.2d 155, 160 (R.I. 2004) (closure effected as soon as defense counsel's

objection to open courtroom was denied); *Owens* v. *United States*, 483 F.3d 48, 63 (1st Cir. 2007) (excluding family members during jury empanelment constituted closure regardless of whether judge ordered closure).[4]

ii. Waller *analysis of full closure.* The closure in this case was "full" rather than "partial."[5] Compare *Commonwealth* v. *Cohen (No. 1), supra* at 110-111 (partial closure where "the record makes clear that there were family members and some other individuals beyond the parties and counsel present in the court room during empanelment"), with *Presley* v. *Georgia,* 130 S.Ct. at 723-725 (full closure where all members of the

---

[4]We are unpersuaded by the claim that no closure occurred because the court officer did not "order" as opposed to "request" that the public leave the room. The testimony of the court officer made clear that the public was excluded as soon as jury selection began, that the only reason that he "asked" rather than "ordered" was to keep members of the public calm, and that he "instructed" members of the public to leave the courtroom.

We also conclude that excluding the public here was not "de minimis" so as not to constitute an unconstitutional closure. See *People* v. *Bui,* 183 Cal. App. 4th 675, 688 (2010) (de minimis closure where members of public "were allowed to return as soon as defense counsel brought the issue to the court's attention and assured the court that they had been appropriately admonished — an alternative to closure considered and promptly implemented by the court").

[5]The record is clear that all members of the public were asked to leave the courtroom at the outset of jury selection. Court Officer Pires testified that when the impanelment process began, there were two or three people in the courtroom, including the defendant's mother, and that he asked them to leave:

> *A.:* "So, usually, my practice would be I would confront whoever — spectators either from the victim's side or plaintiff's or defendant's side or whatever, and I would request if they could just step out and just hold tight outside while we did the [e]mpanelment process, due to the fact that it is somewhat limited with space."

> *Q.:* "When you say 'request,' what do you mean by 'request'?"

> *A.:* "My practice is I usually don't order anyone to either step out. I throw everything — I try to throw it out as a request, a question to them, basically, just try to keep everybody calm."

> *Q.:* "Do you recall if you did that in this case?"

> *A.:* "That's my practice. I do it with every case."

Because a review of the record indicates that all members of the public were asked to leave the courtroom during jury selection and no contradictory evidence has been presented, this was a complete, rather than a partial closure.

public were excluded from the courtroom). In order to justify a full closure, *Waller* v. *Georgia*, 467 U.S. 39, 48 (1984), establishes that four factors must be addressed: "[1] the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, [2] the closure must be no broader than necessary to protect that interest, [3] the trial court must consider reasonable alternatives to closing the proceeding, and [4] it must make findings adequate to support the closure." See *Presley* v. *Georgia, supra* at 723-724. Where there is a "full" closure, as here, the trial judge must make his findings contemporaneous with the closure. See *Commonwealth* v. *Cohen (No. 1), supra* at 116 n.32, citing *Bowden* v. *Keane*, 237 F.3d 125, 131-132 (2d Cir. 2001) ("while specific findings required before complete closure, 'competent evidence from the record' can support partial closure").

In *Presley* v. *Georgia*, 130 S.Ct. at 725, referring only to the third *Waller* factor and determining that the trial judge had not considered alternatives to closing the proceeding to the public for lack of seating, the United States Supreme Court found it unnecessary to consider the other *Waller* factors, and reversed, holding that the defendant's Sixth Amendment right to a public trial had been violated.[6] The Court held that "trial courts are required to consider alternatives to closure even when they are not offered by the parties" and that "[t]rial courts are obligated

---

[6]We note that the other factors do not necessarily aid the Commonwealth's case. The first factor, the existence of an "overriding interest" in the closure, does not cut in favor of the Commonwealth. Where, as here, there is a full closure, lack of courtroom space has generally not been held to be sufficient to "override" the Sixth Amendment public trial right. See *Commonwealth* v. *Martin*, 417 Mass. 187, 196 (1994). Compare *Commonwealth* v. *Cohen, supra* at 112 (where there is a partial closure, and the moving party need establish not an "overriding interest," but a "substantial interest," lack of space could in some circumstances satisfy that lower burden).

The second *Waller* factor, that the closure be no broader than necessary to protect the overriding interest, is not supported by the record. As in *Commonwealth* v. *Cohen (No. 1), supra* at 113, the judge did not make a particularized determination about available space for members of the public. Furthermore, the court officer's routine instructing of spectators to leave during jury selection "runs counter to the requirement that a court make a case-specific determination before a closure of any part of a criminal proceeding constitutionally may occur." *Id.* at 114. See *Watters* v. *State*, 612 A.2d 1288, 1291 (Md. 1990), cert. denied, 507 U.S. 1024 (1993) (unjustified closure based on overcrowding where trial court "could not show that the exclusion

of all to take every reasonable measure to accommodate public attendance at criminal trials." *Ibid.* at 724-725. Here, we are instructed by case law not available to the careful trial judge; instead of rejecting defense counsel's objection out-of-hand, the trial judge was required to consider alternatives to excluding the defendant's family and other members of the public. See *Presley* v. *Georgia, supra* at 725 ("Without knowing the precise circumstances, some possibilities include reserving one or more rows for the public; dividing the jury venire panel to reduce court room congestion; or instructing prospective jurors not to engage or interact with audience members"). See also *Commonwealth* v. *Edward*, 75 Mass. App. Ct. 162, 172-173 (2009). The failure to do so, in and of itself, establishes that the defendant's right to a public trial was violated. The violation of a right to a public trial "is a structural error and not susceptible to harmless error analysis." *Commonwealth* v. *Cohen*, 456 Mass. at 105, quoting from *Commonwealth* v. *Baran*, 74 Mass. App. Ct. 256, 296 (2009). Therefore, we reverse the judgments, set aside the verdicts, and remand for a new trial, as the Commonwealth may elect.

2. *Solicitation instruction.* The indictment charged that the defendant "did solicit, counsel, advise, entice or induce John W. Jamroz to commit a felony, to wit: MURDER, with the intent that such person commit or procure such felony in violation of the common law." "The solicitation of 'another to commit felony or other aggravated offence' is an 'indictable offence at common law' in Massachusetts." *Commonwealth* v. *Barsell*, 424 Mass. 737, 738 (1997), quoting from *Commonwealth* v. *Flagg*, 135 Mass. 545, 549 (1883). "Conviction of the common-law crime of solicitation to commit murder requires proof that the defendant solicited, counseled, advised, or otherwise enticed another to commit murder and that the defendant intended that the person in fact commit the murder." *Commonwealth* v. *Lena-*

---

of all persons was a narrowly tailored means of protecting that interest. There was no effort to ensure that petitioner's family could be present . . .").

As to the fourth factor, the judge did not "make findings adequate to support the closure." *Waller* v. *Georgia, supra.* Instead, after concluding that there was no room, the judge did not allow members of the public into the courtroom and continued the jury empanelment without considering any accommodations that could be made to include the public.

*han*, 50 Mass. App. Ct. 180, 186 (2000). The defendant takes issue with the jury instruction on solicitation.[7] She contends that by instructing that the jury could convict the defendant of solicitation based on a finding that "the defendant intended that the person, in fact, commit *or* procure the commitment of the felony alleged," the judge impermissibly altered the elements of solicitation. She argues that without proof of her intent that Jamroz personally kill her husband, there can be no conviction for solicitation. We disagree.

First, in Massachusetts, one who procures another to commit murder is an accessory before the fact to murder, and shall be punished in the same manner as of the principal. G. L. c. 274, § 2, as amended by St. 1973, c. 529, § 1 ("Whoever aids in the commission of a felony, or is accessory thereto before the fact by counselling, hiring or otherwise procuring such felony to be committed, shall be punished in the manner provided for the punishment of the principal felon"), and G. L. c. 274, § 3, as amended by St. 1973, c. 529, § 2 ("Whoever counsels, hires or otherwise procures a felony to be committed may be indicted and convicted as an accessory before the fact, either with the principal felon or after his conviction; or may be indicted and convicted of the substantive felony, whether the principal felon has or has not been convicted, or is or is not amenable to justice"). See *Commonwealth* v. *Rodriguez*, 457 Mass. 461, 482-487

---

[7] The judge instructed as follows:

"The defendant is charged with solicitation of a felony, specifically, murder. Under the common law, it's a crime for one to counsel or solicit another to commit a crime, even if the solicitation has no effect and the crime counseled is not actually committed.

"To prove the defendant guilty of this offense, the Commonwealth must prove three elements beyond a reasonable doubt: First, that the defendant solicited, counseled, advised, or otherwise enticed another, in this case John W. Jamroz. Second, that the solicitation was to commit a felony, that is murder. Third, that the defendant intended that the person, in fact, commit or *procure the commitment of the felony alleged.* To procure means to obtain by particular care or effort or to bring about or achieve. Solicitation means the act of asking, urging, advising, commanding or otherwise provoking another person to do an act. The offense is complete upon the solicitation and it does not require proof that the offense was carried out or even that the person solicited agreed to commit the crime." (Emphasis added.)

(2010). There is no legal distinction between someone who commits a murder as an accessory as opposed to a principal; therefore, an individual who "procures" a murder also "commits" murder in the eyes of the law. See *Commonwealth* v. *Perry*, 357 Mass. 149, 151 (1970). Thus, if Jamroz had acceded to the defendant's request and had found someone else to murder the defendant's husband, and that person had in turn personally killed her husband, Jamroz would have been indictable for a felony. Whether the defendant solicited Jamroz to personally kill her husband or to find another to do so is thus of no consequence. Either act constitutes a felony, and under either fact pattern, the defendant would be guilty of soliciting a felony.

Second, we have upheld convictions of the common-law crime of solicitation where the defendant solicited another to provide assistance in procuring someone to commit the crime. Indeed, both *Lenahan, supra,* and *Commonwealth* v. *Hamel,* 50 Mass. App. Ct. 250, 260-261 (2001), cited by the defendant, involve initial solicitations of accessories. Thus, *Hamel, supra,* presents an analogous fact pattern. There, the defendant was guilty of solicitation to murder where he told his cellmate — who obviously could not himself commit the murder — that he wanted to "get rid of" his wife's ex-husband, and the cellmate (who was a government informer) brought the information to prison officials, one of whom posed as "Jack," the intended hitman. That the defendant ultimately spoke with the purported hitman (unlike the instant case) is not a material distinction, nor a necessary condition for establishing solicitation. In *Hamel,* we upheld the defendant's conviction for "the common-law crime of soliciting *others* to commit [the] murders," thereby encompassing the defendant's outreach to *both* the cellmate and the hitman (emphasis added). *Id.* at 250-251. *Lenahan* is not to the contrary. In that case, the defendant took an extra step of direct contact with the purported hitman, was involved in the initial solicitation of an accessory, and the hitman (an undercover police officer), procured by the accessory, was then directly solicited by the defendant. See *Lenahan,* 50 Mass. App. Ct. at 186 (we "look [in part] to his conversations with Genest . . . in which he expressed his desire that his wife be killed and that Genest find someone willing to perform the deed . . .").

Nothing in the language of these opinions supports the defendant's proposition that common-law solicitation does not pertain to the solicitation of an accessory — indeed, the cases involve the solicitation of accessories. See *Commonwealth* v. *Furst*, 56 Mass. App. Ct. 283, 284 & 285 n.2 (2002) (suggesting that the facts supported the "more obvious offense" of solicitation, [instead of threatening to commit a crime, the charged offense] where the defendant repeatedly told a friend that she wanted her husband to "disappear," to be "killed," and to be "taken care of").

That the defendant need not specifically intend that the person solicited, Jamroz, actually commit the act of killing in order to be guilty of solicitation has support in the scholarly literature and in cases decided in other jurisdictions. As one commentator has observed:

> "In the usual solicitation case, it is the solicitor's intention that the criminal result be directly brought about by the person he has solicited; that is, it is his intention that the crime be committed and that the other commit it as a principal in the first degree, as where A asks B to kill C. However, *it would seem sufficient that A requested B to get involved in the scheme to kill C in any way which would establish B's complicity in the killing of C were that to occur. Thus, it would be criminal for one person to solicit another to in turn solicit a third party,* to solicit another to join a conspiracy, or to solicit another to aid and abet the commission of a crime (footnotes omitted) (emphasis added)."

2 LaFave & Scott, Substantive Criminal Law, § 6.1(c), at 10 (1986). See *State* v. *Furr*, 292 N.C. 711, 720, cert. denied, 434 U.S. 924 (1977) (because "[t]he gravamen of the offense of soliciting lies in counseling, enticing or inducing another to commit a crime," it was of no consequence that the person solicited was only solicited to find a killer); *Moss* v. *State*, 888 P.2d 509, 517-518 (Okla. Cr. 1994) (same); *State* v. *Yee*, 160 Wis. 2d 15, 16-17 (1990) (same); *Johnson* v. *State*, 650 S.W.2d 784, 787 (Tex. Cr. App. 1983) (same); *Meyer* v. *State*, 47 Md. App. 679, cert. denied, 454 U.S. 865 (1981) (same); *People* v. *Bloom*, 149 App. Div. 295, 296 (N.Y. 1912).

In short, there was no error in the jury instruction; the jury

were properly instructed that the defendant could be convicted by finding that she solicited Jamroz and intended that Jamroz commit the murder by procuring someone to commit the actual act.

3. *Prior bad acts testimony.* The defendant argues that the trial judge erred by denying her motion in limine to preclude the testimony of Jill Scibelli regarding her conversation with the defendant, in which the defendant told Scibelli that she needed a "favor" from Scibelli's husband; specifically, she needed his help in getting "rid of a problem." When Scibelli questioned the defendant regarding her meaning, the defendant asked whether or not her husband was "a Scibelli" and whether he could refer the defendant to one of his relatives. Scibelli responded that her husband "was not like that." The judge was correct in concluding that such evidence did not constitute impermissible prior bad act evidence because it was relevant to show the defendant's plan, intent, and motive to find someone who would kill her husband. See *Commonwealth* v. *Jewett*, 442 Mass. 356, 370-371 (2004); *Commonwealth* v. *Butler*, 445 Mass. 568, 573-574 (2005); Mass.G.Evid. § 404(b) (2010). We also note that immediately after Scibelli's testimony, the judge gave the jury a strong limiting instruction.[8] See *Commonwealth* v. *Barrero Cruz*, 456 Mass. 741, 750 (2010). The judge also repeated the instruction in his final charge. There was no error here.

4. DiGiambattista *instruction.* Prior to trial, the defendant moved to exclude portions of a signed statement that she had given to the State police on March 22, 2006, noting that the police had failed to record her entire statement. She argued that the failure of the police to record the entire statement on videotape was intentional, and therefore, the portions of the

---

[8]The judge instructed:

"[T]he defendant is not charged with committing any crime, other than the charges contained in the indictment. You have just heard mention of other acts allegedly done by the defendant. You may not take that as a substitute for proof that the defendant committed the crime charged, nor may you consider it as proof that the defendant has a criminal propensity or bad character.

"However, you may consider it on the limited issues of the defendant's motive, state of mind, plan, or pattern of conduct. You may not consider this evidence for any other purpose, specifically, you may not use it to conclude that the defendant committed the other act, she must have also committed this charge."

written statement that were not electronically recorded should be excluded.

The motion judge held an evidentiary hearing regarding the videotaping and interview of the defendant. The evidence at the hearing showed that the defendant accompanied State Troopers Gary Fitzgerald and Michael Blanchette to the Wilbraham police department so that they could interview her regarding allegations that she wanted to have her husband killed. The defendant was given her rights pursuant to *Miranda* v. *Arizona*, 384 U.S. 436 (1966). She was also informed that the entire interview would be electronically recorded.

The defendant corroborated much of the information that Jamroz had provided. According to a written statement the defendant signed,[9] she told the troopers that she had access to $81,000 dollars in a checking account and $200,000 dollars in a life insurance policy to pay someone to take care of her husband. She also said that she had a subsequent conversation with Jamroz telling him that she was working out the problems with her husband. The defendant characterized the ideas she discussed with Jamroz as "stupid" and that she was not going to kill her husband. At the conclusion of the interview, the defendant was given an opportunity to review the typed statement and make corrections. She took some time reading the statement and made a number of changes to the statement. She then initialed each page twice and signed the statement. This review and signature process was captured on videotape.

The circumstances relating to the gap in the videotape recording were as follows. Roughly "two hours" into the interview, Trooper Blanchette received a call on his cellular telephone. Blanchette left the interview room and proceeded to the hallway to take the call. While outside, he became aware that the tape had ejected from the videotape cassette recorder (VCR) because it was full. He promptly told a Wilbraham officer, who obtained a new tape, put it in the VCR, and made sure the recording was being made.

---

[9]The preamble to the written statement reads as follows: "The Following statement is being made by Donna M. WOLCOTT. . . . This statement is being taken at the Wilbraham PD on Wednesday, March 22, 2006. This statement is being taken by Trooper Gary E. Fitzgerald and Trooper Michael J. Blanchette. This statement begins at 3:05 PM."

At the suppression hearing, the defendant fully adopted the portions of the statement that were recorded. The prosecutor walked the defendant through the contents of the signed statement, and she testified that it accurately detailed the portions of the interview that had been recorded. The defendant only controverted the accuracy of the inculpatory portions that were not recorded.[10]

The motion judge found that the troopers' failure to record the interview can be characterized as reckless but "not deliberate." She denied the defendant's motion to exclude the written statement, ruling that the appropriate remedy was to give the jury an instruction pursuant to *Commonwealth* v. *DiGiambattista*, 442 Mass. 423, 447-448 (2004). That instruction was indeed given to the jury,[11] who also heard testimony regarding the videotaping and the taking of the written statement. We affirm the order denying the motion to exclude,[12] and also agree that the issuance of the *DiGiambattista* instruction was an adequate remedy.

---

[10]The defendant was unaware which portions were not recorded at the time of her endorsement of the written statement. The challenge as to whether she said certain things (now known not to have been recorded), and whether those statements were factually accurate, could have been made by the defendant at the time of its creation. Indeed, the defendant did not disclaim her review of the written statement and the fact that she had made changes to it. As noted, this portion of the interview, in which she reviewed and signed the written statement, was recorded.

[11]The trial judge instructed:

> "As you are aware, the statements of the defendant to the Massachusetts State police were not recorded by either audio or visual tape videotape in their entirety. Our Supreme Judicial Court has expressed a preference that interrogations be recorded when practicable, an unrecorded statement does not present to the jury evidence of the totality of the circumstances; but, instead, only presents the jury with an abbreviated summary of those circumstances and the interrogating officers' recollection of the highlights of those circumstances. Consequently, when the Commonwealth introduces evidence of the defendant's confession or statement that is a result of the custodial interrogation or an interrogation at a place of detention, and there is not at least an audio tape recording of the complete interrogation, the jury should use great caution when trying to assess the totality of the circumstances. You are advised that the absence of a recording permits, but does not compel you, the jury, to conclude that the Commonwealth has failed to prove voluntariness beyond a reasonable doubt."

[12]"In reviewing a ruling on a motion to suppress, we accept the judge's

See *Commonwealth* v. *Pimental*, 454 Mass. 475, 479-480 (2009); *Commonwealth* v. *Jones*, 75 Mass. App. Ct. 38, 45-46 (2009).

We determine that there is no clear error presented by the motion judge's findings of fact. The circumstances of the interrogation and the creation of the statement were borne out by testimony of both the officers and the defendant at the hearing, and ultimately at trial. Our review supports the motion judge's finding that the videotape recorder malfunction was accidental.[13]

We further determine that the motion judge was correct in her legal conclusions. "The failure to record, by itself, does not render a confession inadmissible." *Commonwealth* v. *Lopes*, 455 Mass. 147, 168 n.18 (2009). However, a "failure to preserve evidence of the interrogation in a thorough and reliable form can comprise a basis for concluding that voluntariness and a valid waiver have not been established beyond a reasonable doubt." *DiGiambattista, supra* at 441. Ultimately though, "[t]he test for voluntariness of a confession is 'whether, in light of the totality of the circumstances surrounding the making of the statement, the will of the defendant was overborne to the extent that the confession was not the result of a free and voluntary act.' " *Lopes, supra* at 167, quoting from *Commonwealth* v. *Selby*, 420 Mass. 656, 663 (1995). Here, in the totality of the circumstances, the judge properly could find that the defendant's statement was voluntary because the defendant reviewed and endorsed the written statement after its creation, including making changes to it.

We also note that "[a] defendant who seeks relief from the

---

subsidiary findings of fact absent clear error 'but conduct an independent review of [her] ultimate findings and conclusions of law.' " *Commonwealth* v. *Scott*, 440 Mass. 642, 646 (2004), quoting from *Commonwealth* v. *Jimenez*, 438 Mass. 213, 218 (2002). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *J.A. Sullivan Corp.* v. *Commonwealth*, 397 Mass. 789, 792 (1986), quoting from *United States* v. *United States Gypsum Co.*, 333 U.S. 364, 395 (1948). See *Commonwealth* v. *Wilson*, 441 Mass. 390, 391 (2004).

[13]The initial intent of the troopers to fully record the statement is evidenced by their readministering Miranda rights to the defendant early in the interview. The testimony did not establish that the officers caused or intended the tape to stop recording. Additionally, Blanchette left the room well into the interview and did not realize the tape had stopped, and only after the most inculpatory statements had been made.

loss or destruction of potentially exculpatory evidence has the initial burden . . . to establish 'a "reasonable possibility, based on concrete evidence rather than a fertile imagination," that access to the [evidence] would have produced evidence favorable to his cause.' " *Commonwealth* v. *Kee*, 449 Mass. 550, 554 (2007), quoting from *Commonwealth* v. *Dinkins*, 440 Mass. 715, 717 (2004). If the defendant meets her initial burden, the court must then weigh the materiality of the evidence, the potential prejudice to the defendant, and the culpability, if any, of the Commonwealth. See *ibid.* Here, even assuming arguendo that the defendant had met her initial burden, there is no evidence that the loss of a portion of the recording of the defendant's statement constituted the loss of exculpatory evidence which prejudiced her. See *Commonwealth* v. *Charles*, 397 Mass. 1, 14 (1986). Moreover, as noted, the troopers did not deliberately fail to record the entirety of her statement. The defendant's contention that she was prejudiced is not based on anything of a concrete nature, but rather a self-serving claim that her written statement is not an accurate record of only a discrete part of her interview, notwithstanding the fact that the videotape shows her reviewing, making changes to, and signing her written statement, and otherwise adopting it as accurate. In sum, the judge's decision reflects a proper "consider[ation] and weigh[ing of] the materiality of the evidence, the potential prejudice to the defendant, and the culpability of the Commonwealth." *Commonwealth* v. *Kater*, 432 Mass. 404, 418 (2000). Moreover, the motion judge correctly determined that giving the *DiGiambattista* instruction, which cautioned the jury to carefully scrutinize an unrecorded statement given by a defendant, was the appropriate remedy. See *Commonwealth* v. *DiGiambattista*, 442 Mass. at 446-449. See also *Commonwealth* v. *Pimental, supra* at 480.

The defendant is entitled to a new trial. Therefore, the judgments are reversed, the verdicts are set aside, and the case is remanded for proceedings consistent with this opinion.

*So ordered.*