Neel, Stephen E., J.
On November 1, 2010, the Court ordered an evidentiary hearing on the defendant’s motion for new trial on the basis of his allegation that the courtroom was closed during im-panelment, in violation of his Sixth Amendment right to a public trial. On January 10, 2011, the Court received evidence as follows: recorded interviews of three of the court officers present during the impanelment which took place on November 27 and 28, 2006, presented by agreement; live testimony by Jennifer Kelley, defendant’s sister, and by Robert Sheketoff, Esq., defendant’s counsel at trial; transcripts of the impanelment portion of the trial; and other exhibits. For the reasons stated below, the motion will be denied.
FINDINGS OF FACT
On the basis of the credible evidence, and inferences reasonably drawn therefrom, the Court finds as follows.
I. The Impanelment Process
On November 27, 2006, approximately 70-80 prospective jurors were brought into Suffolk Superior Court, Courtroom 914, which had seating capacity in the public gallery section for about fifty. The venire were ready and impanelment began at 10:15 a.m. Tr. 1-4. The Court stated to the venire at the outset: “I apologize to those of you who are standing up. We have almost, but not quite, enough seats for everyone.” Tr. 1-7.
The Court’s statement suggests that, in addition to the seats in the gallery, prospective jurors were also seated in the jury box and in other seats within the well of the courtroom, and that a number of prospective jurors were still required to stand. The Court continued: “Fairly shortly we will have seats opening up or we’ll be able to provide a place for you to sit down.” Id. That statement suggests that the Court expected not only that seats would become available in the normal process as prospective jurors were excused, but also that alternate space, in another, empty courtroom was or would become available to hold a portion of the venire.
That is in fact what happened: as reflected at Tr. 1-26-27, following the conclusion of the Court’s general questions to the venire and before individual voir dire began, the Court directed Court Officer Richard Linehan to take the twenty prospective jurors at the end of the jury list to “a room just very close to this room.” Id. at 1-26. The Court did so “so that everybody can have a place to sit.” Id. Impanelment continued *601 until 4:30 p.m., by which time eight jurors were in the jury box. Tr. 2-23.[1]
The next morning, the Court greeted a new group of prospective jurors. The record does not reflect the number of prospective jurors in the courtroom. However, the Court did not apologize to the venire for a lack of seating, as it had the first day. See Tr. 2-6. Nor, at the end of the general questions to the venire and before individual voir dire began, did the Court direct any portion of the venire to be taken to another courtroom to allow sufficient seating for all. Tr. 2-23. Impanelment was completed by about 12:30 p.m. the next day. Tr. 2-138.
The Court finds that, on the first day of impanelment, there was no room in the courtroom, initially, for any persons besides prospective jurors; that, at some point or points during that day, there were more seats available than prospective jurors. The Court finds that, on the second day of impanelment, there may have been extra seats from the outset, and certainly were at some point that morning before im-panelment was completed at 12:30 p.m.
II. Jennifer Kelley
Ms. Kelley is defendant’s sister. She attended the trial daily, and was present in the courtroom on the first day of impanelment, just before court officers began bringing panels of prospective jurors into the courtroom. As Kelley states in her affidavit, Ex. 4, Court Officer Richard Lineman stated that she and her party[2] would have to leave the room “because all the seats were required for the people who were going to be jurors.” Defendant and his attorney, Robert Sheketoff, were present; Attorney Sheketoff heard the officer’s statement, and repeated it to Kelley. When she asked if she and her party could remain “because we were a little afraid of the other people waiting outside,” Off. Linehan told her that “we had to leave so there would be room for the people who had to be there.” Id.
At the hearing, Kelley testified that Off. Linehan stated that the courtroom was “closed” for jury selection, and that she and her party had to leave. The Court finds that her statement in her affidavit, quoted above, is the accurate version of what happened.
As noted, the impanelment took place in Courtroom 914. Upon leaving that courtroom, one enters a large foyer; straight ahead are doors into Courtroom 916; to the right are double doors leading out to the hallway, which in turn leads, through double doors, to the central, public elevator lobby. When one enters the hallway from the foyer, there are benches to the left and right.
Kelley and her party left the courtroom as instructed by Off. Linehan, walked to the hallway outside, and sat on a bench there. From that bench Kelley was able to see, at the end of the hall to the right, groups of prospective jurors being led by court officers into the courtroom through a side door at that location.
Kelley sat on that bench, or otherwise waited in the hallway, for the two days of impanelment. She did not again ask any court officer, during impanelment, whether there were any available seats, nor did she ever look in the courtroom to see whether seats had become available for her as impanelment progressed. No court officer (other than Off. Linehan, prior to impanelment) spoke to her or her party during im-panelment about whether they might enter the courtroom. Kelley did not observe, and there were not, any signs on the entrance door to Courtroom 914 barring the public, or any officers at the door preventing entrance by the public. At no time while court was in session was the entrance to the courtroom locked.
Prior to trial, the Court allowed defendant’s motion for permission to have family members bring clothes to court for defendant to wear during trial. Kelley or her mother brought such clothes each morning, and gave them to Off. Linehan or another court officer.
Kelley discussed with defendant, before and during trial, their concerns about the large number of law enforcement personnel who were likely to attend the trial (the victim, Richard Dever, had been a deputy with the Suffolk County Sheriffs Department). She also discussed with defendant, during trial, the fact that she and her party had been asked to leave the courtroom just before prospective jurors were first brought to the courtroom.
In January 2009, Kelley discussed with her mother a telephone conversation which her mother reported having had with defendant. Debbie Lang informed her daughter that defendant had telephoned her from prison that month, and had said that a friend of his in prison had been granted a new trial because the public was excluded from jury selection in his case.[3] Debbie Lang reported that defendant had encouraged her and Kelly to provide affidavits saying that they were similarly excluded. Kelley subsequently discussed the same with defendant. She and her mother signed the affidavits supporting this motion the following July.
III. Attorney Robert Sheketoff
Attorney Sheketoff has practiced criminal defense in Suffolk Superior Court for many years. At the time of defendant’s trial in 2006, he was aware of defendant’s right to a public trial; he also believed, based on his experience, that it was the “acceptable common practice,” and not objectionable, to exclude the public during impanelment when the courtroom was filled with prospective jurors such that no room remained for members of the public. While he has no specific memory of the impanelment in this case, with some exceptions,[4] at the time it would not have occurred to him to object. Specifically, he did not believe that a defendant’s family had a right to remain in the courtroom during jury selection.
*602 Consequently, Attorney Sheketoff did not discuss with the defendant whether defendant’s family members had a right to attend the impanelment. He does not recall discussing the matter with those family members; he would often tell members of a defendant’s family that impanelment, particularly where most of that proceeding occurred at side-bar with individual jurors, was boring. He does not recall discussing either with defendant or his family members whether the latter had been excluded from the impanelment. He does recall that there were more prospective jurors in the courtroom than seats available.
Prior to trial, Attorney Sheketoff filed a motion titled “Defendant’s Motion Re: Public Audience.” Ex. 5. The motion asked the Court to “closely monitor and control the public audience for this trial.” Because the victim was a Suffolk County Deputy Sheriff and his brother a Boston police officer, defendant was concerned that a large presence of members of those departments at trial “presents a clear and present danger of intimidation of the defendant’s family, counsel, and jurors.” The motion sought an order that, inter alia, no such individuals appear in uniform, wear buttons or similar displays, and “that the number of persons from these groups be restricted to ten at a time.”
At a pretrial hearing on November 21, 2006, the Court heard counsel on the motion. Defendant was present. Tr. at 4. ADA Edmond Zabin stated that “I think I can agree to most of it, except for the limiting group [sic] of people to ten at a time . . . they’re members of the public and have a right to be here.” Id. at 46. Mr. Zabin stated he would “speak to individuals in law enforcement about uniforms in the courtroom and certainly on the buttons and similar displays.” Id. at 47. Attorney Sheketoff responded: “With those attempts, and we’ll see how it goes. I will withdraw my request that the number be restricted.” Id.
IV. Recorded Statement of Court Officer Richard Linehan
Ex. 1 is a DVD of a statement given by Off. Linehan on December 16, 2010, to Boston Police Sgt. Det. James Wyse and Sgt. Det. Daniel Coleman. Off. Linehan is an experienced court officer, having served since 1994. The Court credits the entirety of Off. Linehan’s statement.
Since at least 2006 Off. Linehan has been a “deputy” of criminal sessions in Suffolk Superior Court. As the deputy, he is responsible for the judge and jurors, and directs other court officers assigned to the session. He lypically, although not always, is the officer who brings the prospective jurors into the courtroom from the jury pool for impanelment.
Off. Linehan was the deputy for the trial of defendant in late 2006. He recalls the trial because he knew the victim, Richard Dever, and because the trial was highly publicized. While he participated in the im-panelment, he does not have any specific memory of it. He believes that he was the officer who brought the jurors into the courtroom after the Court instructed impanelment to begin. He recalls defendant’s mother, sister (Kelley) and Kelley’s boyfriend being at the trial most days, but does not recall whether they were present on the two days of impanelment.
After the defendant was brought to the courtroom, and before Off. Linehan left to collect the first group of jurors, Off. Linehan does not recall whether there was anyone sitting in the gallery benches behind the bar, and does not recall anyone approaching him and asking to come into the courtroom. He does not recall defendant or his attorney making any requests of him during impanelment.
While he has no specific memory of the impanelment of this case, at that time, and for some time before, Off. Linehan’s practice regarding impanelment of cases with large venires was as follows. Where it was likely that the courtroom was not large enough to seat everyone in the venire, he or another officer would “clear” the courtroom, i.e., direct anyone sitting in the gallery, where the venire would be seated, to leave the courtroom. If a member of the public objected, Off. Linehan would tell them there was no place to sit; if the person persisted, he would tell them to wait until things “die down” and room becomes available where he could seat the person. If the person expressed a specific reason for wanting to attend even though there was no room — e.g., because he or she was a member of the alleged victim’s, or the defendant’s, family — that would be out of the ordinary, and Off. Linehan would bring that to the judge’s attention.
V. Recorded Statement of Court Officer Antonio Centeio
Ex. 2 is a DVD of a statement given by Court Officer Antonio Centeio on December 16, 2010, to Sgt. Det. Wyse and Sgt. Det. Coleman. Officer Centeio became a court officer in 2006, about six months before the trial of this case. The Court credits the entirety of Off. Centeio’s statement.
Off. Centeio was one of the officers assigned to Courtroom 914 for defendant’s trial. He was responsible for bringing defendant up to the courtroom from the lockup, unshackling him, sitting behind defendant while court was in session, and returning him to the lockup during breaks and at the end of the court day. During impanelment, Off. Centeio would read out the numbers of prospective jurors who held up their cards in answer to the court’s questions to the venire.
Before the impanelment in this case began, Off. Centeio brought defendant to the courtroom. He does not recall whether anyone besides trial participants were in the courtroom, or whether, when jurors began to enter, anyone attempted to enter the courtroom or was instructed to leave the courtroom. The doors were not locked during impanelment, and no officer was posted at the door, so there was no physical bar to anyone coming into the courtroom through the main *603 door. Off. Centeio does not recall that he asked anyone to leave the courtroom at any time during impanelment.
At no time during impanelment did the defendant or his attorney ask Off. Centeio to allow anyone into the courtroom, nor did Off. Centeio have any discussion with anyone about entering the courtroom or being asked to leave.
VI. Recorded Statement of Court Officer Thomas Arcadipane
Ex. 3 is a DVD of a statement given by Court Officer Thomas Arcadipane on December 16, 2010, to Sgt. Det. Wyse and Sgt. Det. Coleman. Officer Arcadipane became a court officer in 2004. The Court credits the entirety of Off. Arcadipane’s statement.
Off. Arcadipane recalls the trial of this case because it was a high profile case, and because the victim was an officer with the Sheriffs Department, working at the Nashua Street jail. While he has no specific recollection of the impanelment, he does recall generally that defendant was brought to the courtroom before impanelment began, and that he was assigned to remain with the defendant during the impanelment. He does not recall whether any members of the public were present; he did not ask anyone to leave, or deny anyone who sought to enter, while the impanelment proceeded. In any event, he was concentrating on the defendant. Neither the defendant nor his attorney made any request of Off. Arcadipane regarding allowing members of the public into the courtroom during impanelment.
None of the live witnesses or court officers had notes or other writings to refresh their recollections of the impanelment in this case. The defendant did not testify.
VII. Additional Findings
On the basis of the foregoing, and the hearing exhibits, the Court finds that just prior to commencement of impanelment on November 27, Off. Linehan instructed Kelley and her party to leave the courtroom, explaining that, in Kelley’s words, “all the seats were required for the people who were going to be jurors.” Kelley Aff. When Kelley asked if she and her party could remain “because we were a little afraid of the other people waiting outside,” Off. Linehan told her that “we had to leave so there would be room for the people who had to be there.” Id.
Kelley and her parfy then left the courtroom, walked into the hall, and sat on a bench. Kelley remained in the hall during the two days of impanelment; defendant has offered no credible evidence as to whether Debbie Lang or Pat Doe were present in the hall during that time as well. While in the hall, Kelley observed jurors being taken into the courtroom through a side door at the end of the hall, to her right as she sat on the bench; she also observed jurors leaving the courtroom, through the same door, as those jurors were excused during impanelment.
At no time did Off. Linehan, Off. Centeio, or Off. Arcadipane state to anyone that the courtroom was “closed” during impanelment. At no time during the impanelment, after being initially instructed to leave the courtroom, did Kelley or her parfy speak with any court officer to ask whether there was room for them to attend; had they done so, and had there been room, they likely would have been seated in the courtroom, separate from the prospectivejurors. At no time during impanelment did Kelley go back to the courtroom entrance to peer through the small windows in the doors to see whether seats had become available. At no time was there any sign on the doors or any officer posted at the doors, nor were the doors locked while court was in session. In other words, after Off. Linehan’s instruction to Kelley and her parfy just prior to the impanelment to leave the courtroom, there was no impediment to their reentering the courtroom to inquire whether they might be seated.
There is no evidence that, following the initial instruction to Kelley and her parfy from Off. Linehan, just prior to bringing in the first prospective jurors, any person sought or was excluded admission to the courtroom during the impanelment. There was no consistent exclusion throughout the impanelment; rather, the Court concludes that, when seats were available, any member of the public wishing to attend would likely have been admitted.
The Court has no independent memory of the im-panelment, and relies on the above findings in deciding the present motion. The Commonwealth points out, and the Court acknowledges, that at the May 2008 trial of Rodrick Taylor, SUCR 06-10703, the Court stated in open court, just prior to impanelment,
[i]s there anyone that either of you are aware from the public, families on either side who wish to be present in the courtroom during impanelment? I mean, the only concern is when we have everybody here because then there’s no room for everybody, even the venire. Once I get through all the questions, there will be room because we will be sending most of them into the other room. So there will be room for people who want to be present. It is a public proceeding, obviously; and I want to preserve that.
Taylor, Tr. 1-26 (attached to Commonwealth’s Opposition to the present motion). The Court believes that it began making the announcement reflected in the quoted language at some time following the trial in this case. Prior to beginning that practice, including in 2006, the Court generally understood and agreed that, where the venire would require all available seats, the public would be instructed to leave and would not re-enter until seats became available. To the extent that requests by members of the public to be present in the courtroom during such impanelments were *604 brought to the Court’s attention, the Court’s practice at that time was to hear and, to the extent possible, accommodate, such requests. The Court does not believe that any such requests were brought to its attention during the impanelment of this case.
RULINGS OF LAW .
In Commonwealth v. Cohen (No. 1), 456 Mass. 94 (2010), the Supreme Judicial Court clarified the circumstances in which a courtroom is considered closed, in the constitutional sense, during impanelment, and the test for determining whether a partial closure constitutes a violation of a defendant’s right to a public trial under the Sixth Amendment. The burden is “clearly on the defendant to demonstrate that the public was excluded from his trial.” Id. at 107.
In Cohen, “the judge’s findings and the testimony of the court officers, which the judge appeared generally to credit, indicate that the public consistently was excluded from the court room based on established court policy that, for at least three days, was graphically and unequivocally communicated by the ‘Do Not Enter’ sign.” Id. at 114. For example, court officers had removed a man from the courtroom during impanelment who was later determined to be a friend of defendant; “at the time [he] was removed, there was ample room for the public to sit in the court room, separated from the prospective jurors.” Id. at 100.
The court first addresses whether the defendant had established that the courtroom was closed:
Some courts have determined that a court room closure may be so limited in scope or duration that it must be deemed “de minimis” or trivial, and not in contravention of the Sixth or First Amendment public trial guarantees; whether the closure was “inadvertent” on the part of the judge is sometimes mentioned as one factor relevant to the analysis. (FN20) We agree with the principles discussed in the cases cited in note 20, supra, but those principles do not govern here.
Id. at 108-09. In note 20 the court cites the referenced cases as follows:
(FN20.) See, e.g., Peterson v. Williams, 85 F.3d 39, 44 (2d Cir.), cert. denied, 519 U.S. 878 (1996) (finding de minimis closure where public excluded for twenty minutes, unknown to judge); United States v. Al-Smadi, 15 F.3d 153, 154-55 (10th Cir. 1994) (same). See also Braun v. Powell, 111 F.3d 908, 917-20 (7th Cir. 2000), cert. denied, 531 U.S. 1182 (2001) (excluding one person did not violate public trial right; court applied analysis of Peterson v. Williams, supra).
Measured against the principles discussed in the cases cited, the court concludes that
[t]he exclusion of members of the public and the press for at least three days of jury selection through the intentional application of a court house policy [including a “Do Not Enter” sign on the door and court officers’ barring members of the public from entering, or instructing them to leave] cannot qualify as inadvertent. Nor can it be characterized as so trivial or de minimis that it falls entirely outside the range of “closure” in the constitutional sense.
Id., at 109.
Here, the exclusion of members of the public was far less extensive: it consisted of two statements by Off. Linehan to defendant’s sister and her party, just before impanelment began: first, that they would have to leave “because all the seats were required for the people who were going to be jurors,” Kelley Aff.; and second (in response to Kelley’s asking if she and her party could remain “because we were a little afraid of the other people waiting outside”), that “we had to leave so there would be room for the people who had to be there.” Id.
No court officer stated that the courtroom was “closed,” either temporarily or for the entire impanelment; there was no sign to that effect; no officer was posted at the courtroom entrance to keep the public out; the courtroom entrance was unlocked; when seats became available, Kelley, her party, and members of the public likely would have been admitted.
Indeed, defendant has established nothing beyond the initial instruction of Off. Linehan, just prior to the bringing in of prospective jurors, that Kelley and her party were to leave the courtroom because there were not enough seats for the prospective jurors; she was not told that the courtroom was closed, or that she could not return. Thus, one implication of what Off. Linehan told her was that, when seats became available, she could be seated. She never inquired of Off. Linehan or anyone else to determine whether that was correct.
Nor has defendant presented any evidence of any other person’s being told, during the impanelment in this case, that he or she could not enter or stay in the courtroom.[5]
Defendant has thus not proved any exclusion of the public beyond the limited exclusion of Kelley and her party on one occasion before impanelment began. The Court concludes that that exclusion was “so trivial or ‘de minimis’ that it falls entirely outside the range of ‘closure’ in the constitutional sense.” Cohen, at 109.
Even if the facts found above were sufficient to constitute a partial closure, the Court concludes that no unconstitutional closure occurred. As the court in Cohen stated, a finding of a partial closure (as in that case) requires examination of four factors identified in Waller v. Georgia, 467 U.S. 39 (1984). Cohen, at 111.
First, there must be a “substantial reason” rather than an overriding interest to justify the closing. Here, as in Cohen, the lack of space to accommodate the general public due to the number of prospective jurors in the courtroom suffices.[6]
*605 The second Waller factor “instructs that a closure may be ‘no broader than necessary to protect [the] interest [likely to be prejudiced].’ ” Cohen, at 113 (brackets in original). The court stated that “[i]n the present case, to the extent that there were insufficient seats in the court room for all the spectators, excluding those who could not be appropriately seated was permissible.” Id. However, the judge made no contemporaneous particularized finding in that regard: “[r]ather, the judge’s finding and the testimony of the court officers . . . indicate that the public consistently was excluded from the court room based on established court policy that, for at least three days, was graphically and unequivocally communicated by the ‘Do Not Enter’ sign.” Id., at 113-14.
Here, although the Court similarly made no contemporaneous “particularized finding” regarding availability of seating, the Court has found that the public was not “consistently . . . excluded” from the courtroom for any period beyond the beginning of the first day of impanelment.
The third Waller requirement “is closely connected to the second; it focuses on consideration of ‘reasonable alternatives to closing the proceeding.’ ” Id., at 115. In Cohen, the judge
took meaningful steps in this direction, holding the empanelment proceedings in the largest available court room and reserving space for the defendant’s family and the press. However, additional alternatives should have been examined. There are ways to communicate to members of the public that the courtroom currently cannot accommodate them other than by placing a “Do Not Enter” sign on the door. The difficulty with such a sign is that it is too easy to forget to remove it when space does become available.

Id.

In the present case, there is no evidence that" the possibility of a larger courtroom was raised by counsel or the Court, nor is there evidence that a larger courtroom was available. Moreover, the Court reserved no space for defendant’s family because no such request was brought to its attention. On the other hand, the Court did make use of an adjacent courtroom to house twenty prospective jurors, as soon as it had finished its general questions to the venire, so that “everybody can have a place to sit." Tr. 1-26. In addition, Off. Linehan communicated to Kelley precisely the message, and did so in the manner, endorsed in the language quoted just above, i.e., that the courtroom “currently cannot accommodate” Kelley and her party. Nor are the judge or court officers required, once that message has been communicated, to “undertake an affirmative effort to seek out spectators when the departure of prospective jurors frees up seats.” Id. at 114 (emphasis supplied). Rather, the Court’s obligation in that instance is to “make sure that members of the public who wish to observe the proceedings are not prevented from doing so.” Id. (emphasis supplied). In the context of this case, where any partial closure was minimal, and no member of the public was prevented from observing the impanelment once the departure of prospective jurors freed up seats, the Court concludes that the measures taken by the Court and Off. Linehan were sufficient to satisfy the third Waller factor.
Finally, “Waller requires ‘findings adequate to support the closure.’ ” Cohen, at 115. In a partial closure context, “a reviewing court may examine the record itself to see if it contains sufficient support for the closure, even in the absence of formal or express findings by the judge.” Id. In this case, neither defendant nor his counsel brought the matter to the Court’s attention until years after the trial, so the Court made no findings at the time of impanelment. Nevertheless, the Court has conducted an evidentiary hearing and made the findings set forth above.
Cohen notes also that a defendant may waive his right to public trial. Id. at 105-06. In view of its decision here, the Court need not address waiver; the Court notes, however, that while defendant was aware of Kelley’s being asked to leave at the time, neither he nor his counsel sought to raise that as an issue with the Court.
Following Cohen, the closure issue has been more recently addressed by the Supreme Judicial Court in Commonwealth v. Greineder, 458 Mass. 207 (2010), and by the Appeals Court in Commonwealth v. Wolcott, 77 Mass.App.Ct. 457 (2010). Wolcott, in which the court found a Sixth Amendment violation, presents circumstances similar to the present case, but with key differences.
In Wolcott, “(t]he venire were brought into the court room and the public was asked to step outside.” Id. at 459. After twenty-four jurors had been interviewed at sidebar, defense counsel informed the judge that “there were people, family members and members of the public, I think, who would like to be able to be in the court room only there wasn’t enough room, but now there is enough room and this is supposed to be a public proceeding, so if they could come in.” Id. at 460. The court responded, “[a]s soon as we have room . . . when we have room, we’ll allow them to come in.” Id. At one point later in the impanelment, counsel moved for a mistrial on Sixth Amendment grounds, which the judge denied without findings.
On the second day of trial, apparently after completion of impanelment, the judge sua sponte raised the defendant’s prior motion, and stated that the court room was small and could not accommodate the family members, and that it was for that reason alone “that some members of the defendant’s family, perhaps, were asked to remain outside because there was simply not room for them.” Id. at 460.
*606 The Appeals Court, stating that “without exception all courts have held that an accused is at the very least entitled to have [her] friends, relatives and counsel present,” id. at 461 (citations and quotation marks omitted), nevertheless cites Cohen for the proposition that
[w]hile “the judge or court officers need not undertake an affirmative effort to seek out spectators when the departure of prospective jurors frees up seats [. . .] if space in the court room is or becomes available, the judge must make sure that members of the public who wish to observe the proceedings are not prevented from doing so.” [Cohen] at 114 . . . Here, the judge did not “announce at the outset that, because of space limitations, it is not possible immediately to accommodate members of the public, but that individuals who wish to observe empanelment proceedings will be permitted to enter the court room as space becomes available.” Id. at 114 n.30. The judge’s on-the-record refusal to allow any members of the public to enter the court room— and the findings that the court officer asked all members of the public to leave the court room, that members of the public remained outside of the court room during jury selection, and the absence of any evidence that these spectators were informed that they could reenter the court room as seats became available — constituted a closure triggering the protections of the Sixth Amendment. See State v. Torres, 844 A.2d 155, 160 (R.I. 2004) (closure effected as soon as defense counsel’s objection to open court room was denied).
Id. at 462-63.
In the present case, defense counsel made no objection to the Court, and consequently there was no “on-the-record refusal to allow any members of the public to enter the court room.” Moreover, in the above-quoted language the Appeals Court repeats the statement in Cohen that “if space in the court room is or becomes available, the judge must make sure that members of the public who wish to observe the proceedings are not prevented from doing so” (emphasis supplied). In view of (1) Coherís statement that neither the judge nor court officers are required to “undertake an affirmative effort to seek out spectators when the departure of prospective jurors frees up seats,” id. at 114, and (2) the lack of any evidence in the present case that, following the exclusion of Kelley and her parly at the beginning of impanelment, any member of the public who thereafter wished to attend was “prevented from doing so,” id., the Court concludes that the circumstances of this case meet the standard enunciated in Cohen.
Moreover, whereas the defendant’s objection in Wolcott, and the judge’s denial of relief, triggered a full closure in that case, Wolcott at 462-63, there was no objection in this case, and the exclusion was de mini-mis.[7]
Accordingly, the Court concludes that (1) defendant has failed to carry his burden of showing that, during impanelment, the courtroom was closed in any but a trivial or de minimis way, and (2) even if the courtroom were found to have been partially closed, the Waller factors as applied in Cohen are in this case satisfied. Accordingly, the Court concludes that defendant has suffered no deprivation of his Sixth Amendment right to a public trial.
ORDER
For the reasons stated above, defendant’s motion for new trial on the basis of his Sixth Amendment right to public trial is DENIED.

 The transcript reflects that the process the Court followed was to fill the jury box with jurors not excused for cause, then allow counsel to exercise peremptory challenges, fill the seats thus emptied with additional jurors, and so forth.

 Kelley’s affidavit states that she “came to the courtroom with my mother the day Frankie was scheduled for jury selection.” At the hearing, she testified that her then-boyfriend, Pat Doe, was also with her that day. Kelley’s mother, Debbie Lang, submitted an affidavit dated July 14, 2009, but did not appear at the hearing, even though Kelley testified that Debbie Lang was at that moment in Charlestown, and was aware of the hearing. Nor was any explanation for Debbie Lang’s absence offered by defendant. The Court credits none of Debbie Lang’s affidavit. The Court finds that Kelley and at least one other person (Debbie Lang or Pat Doe, or both), were present in Courtroom 914 on the morning of November 27, 2006, just before impanelment began. There is no evidence that any other members of the public were in the courtroom as well.

 Defendant placed the call to his mother from MCI-Cedar Junction at 1:35 p.m. on January 10, 2009.

 Attorney Sheketoff does recall that the impanelment took place in one of the smaller courtrooms. He believes that the trial may have been moved to a larger courtroom; his best memory is that that occurred during impanelment. The docket reflects that the entire trial took place in courtroom 914.

 As found above, Off. Linehan’s practice was to tell members of the public to wait until things “die down” and room becomes available; it was also his practice to bring to the judge any requests that were out of the ordinary.

 A second reason in the present case may be found in the prevention of “the intermingling of prospective jurors with spectators [here, Kelley and her party] who might have some connection to or express opinions about the case, and the potential taint of the jurors that could result.” Id., at 111-12. Off. Linehan’s statement reflects his concern, from past experience, about keeping defendants’ friends or family members seated separately from prospective jurors to avoid just such potential “taint.”

 To the extent that defendant argues that Attorney Sheketoff s failure to alert him and the Court to his right to have family members present during impanelment constituted ineffective assistance, the Court concludes that Attorney Sheketoffs representation of defendant, based on his general understanding of defendants’ rights during im-panelments in 2006, does not fall below the level expected of average competent counsel at that time. See Commonwealth v. Saferian, 366 Mass. 89 (1974).