[No. E061050. Fourth Dist., Div. Two. Sept. 15, 2015.]

THE PEOPLE, Plaintiff and Respondent, v.
ERIC SCOTT NELSON, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III, IV, V, and VI.

**COUNSEL**

Mark D. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, Lynne G. McGinnis and Felicity Senoski, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**RAMIREZ, P. J.**—Defendant Eric Scott Nelson was going through a contentious divorce. After his friend Laura Tatarzyn mentioned getting a hit man to kill her boyfriend, defendant started talking to her—seemingly seriously—about having the same hit man kill his wife. He said to Tatarzyn, "You should ask for a two-for-one deal." Tatarzyn told defendant's wife, who told the police.

Juan Anguiano, an undercover officer, contacted defendant and pretended to be the hit man. He asked, "[Y]ou have a job for me[,] right?" Defendant said, "Yes." They agreed to meet at a Walmart in two days. At Anguiano's request, defendant agreed to bring a photograph, an address, and $300. Meanwhile, however, defendant's girlfriend learned that he was planning to have his wife killed. She threatened to leave him if he went through with it, and he did not go to the meeting.

Nevertheless, defendant was arrested for solicitation of murder. While he was in jail, he phoned his wife, in violation of a restraining order. He also phoned his girlfriend and tried to talk her into recanting her statements incriminating him.

The charges against defendant and the outcome of those charges were as follows:

| Count | Charge | Statute | Outcome |
|---|---|---|---|
| 1 | Solicitation to commit murder | Pen. Code, § 653f, subd. (b) | Guilty verdict |
| 2 | Carrying a concealed, loaded, unregistered firearm | Pen. Code, § 25400, subds. (a)(2), (c)(6) | Guilty plea |
| 3 | Violating a restraining order | Pen. Code, § 273.6, subd. (a) | Guilty verdict |
| 4 | Dissuading a witness on August 29, 2013 | Pen. Code, § 136.1, subd. (a)(1) | Guilty verdict |
| 5 | Dissuading a witness on September 16, 2013 | Pen. Code, § 136.1, subd. (a)(1) | Hung jury; dismissed |

Defendant was sentenced to a total of eight years in prison, calculated as follows: (1) On Count 1, the principal term, six years (the midterm); (2) on Count 2, two years (the midterm), to be served concurrently; (3) on Count 3, a misdemeanor, one year, to be served concurrently; and (4) on Count 4, two years (the midterm), to be served consecutively.

Defendant appeals.[1] In the published portion of this opinion, we will hold that defendant could commit solicitation of murder by soliciting Tatarzyn to solicit an unnamed hit man. In the unpublished portion of this opinion, we will hold that defendant's conviction for dissuading a witness must be reversed; otherwise, we find no prejudicial error. Accordingly, we will reverse in part and remand for resentencing.

I

FACTUAL BACKGROUND

Defendant and Jane Doe[2] were married in 1988. In January 2013, Doe told defendant that she was going to get a divorce. However, they continued to live in the same house. They had various disagreements about property division, spousal support, child support, and child custody. As a result, defendant was angry and "very unhappy."

In April 2013, defendant rented a house on his property to Laura Tatarzyn. They became friends. Defendant discussed his problems with his wife with Tatarzyn "[e]very day."

Meanwhile, Tatarzyn was having problems of her own with Edgar, the father of her child. In June 2013, her friend Yoshi said jokingly, "[You] could always go find somebody in T[ijuana] to go take care of it," meaning that she could hire someone to kill Edgar.

Tatarzyn told defendant about her conversation with Yoshi. Defendant seemed to find it funny. However, a week or two later, he asked her for Yoshi's phone number. He explained that "he was having a really rough time with his wife . . . ." Tatarzyn claimed she did not have the number.

On July 12, 2013, defendant asked again for Yoshi's phone number. He said that he needed someone to "take care of" his wife, because he was

---

[1] Defendant has also filed a petition for writ of habeas corpus (*In re Nelson* (Sept. 15, 2015, E062035), petn. den.). We ordered the writ petition considered with this appeal for the purpose of determining whether an order to show cause should issue. However, the two cases have not been consolidated. Thus, we will rule on the petition by separate order.

[2] The trial court ordered that defendant's wife be referred to by this fictitious name. (See Pen. Code, § 293.5.)

desperate and there was no other way out. Tatarzyn said that she was going to Tijuana for other reasons, and while she was there, she would "take care of" Edgar. Defendant said, "You should ask for a two-for-one deal."

That same day, Tatarzyn contacted Doe. She told Doe that defendant had asked her for the phone number of a hit man and she was in fear for Doe's life. Later that day, Doe called the police. As a result, Investigator Robert Cornett interviewed Tatarzyn.

Meanwhile, Tatarzyn went to Tijuana to go to a party. While she was there, she texted defendant that she was buying "pig meat" from a "farmer" whom Yoshi knew for $1,000. She intended this to be "code" meaning that the hit man charged $1,000. She thought defendant would understand because he slaughtered pigs. When he did not seem to understand, however, she also texted, "I'm not talking about pigs. Think Scott. Why am I going to Tijuana?" He replied, "Yes I understand the menu now."

That night, when Tatarzyn got back, she talked to defendant about the supposed hit man in Tijuana. Unbeknownst to him, she recorded the conversation. The recording was admitted into evidence and played for the jury. Among other things, they said:

"TATARZYN: So I went to TJ.

"NELSON: How'd that go? [¶] . . . [¶]

"TATARZYN: . . . So I told him that . . . you were interested.

"NELSON: Yeah.

"TATARZYN: So. The, the way it would be pretty nifty too.

"NELSON: Really?

"TATARZYN: Yeah. It's a barrel of they, they just, he just does it and then he puts it in a barrel with tar mixed with oil and so I guess the consist . . . the consistency is, it doesn't, cause when you go back across the border it doesn't, they don't scan. So you'd take it back across the border as like [p]etrol and then from there it's just, nobody cares. So apparently he's done like seventeen so far.

"NELSON: Shit.

"TATARZYN: So if you want, he said he'd come up here, he just needs like two or three days cause he's doing something else.

"NELSON: Yeah. [¶] . . . [¶]

"TATARZYN: . . . I mean he'll be up here in a couple of days.

"NELSON: Yeah, [w]ell he's, think he's pretty clean and professional.

"TATARZYN: Yeah. It's [c]artel for you. They don't, they don't mess around.

"NELSON: Yeah, cause you wouldn't believe the shit that[']s . . .

"TATARZYN: What happened?

"NELSON: No, it's just constant. It gets worse and worse you know. It's just constant attacking me . . . . [¶] . . . [¶]

"NELSON: Blah, blah you're such an asshole. You, you're never going to see the kids on Thanksgiving and it's just like . . . . It's just constant.

"TATARZYN: But are you willing to go through with it the whole way, cause . . . ?

"NELSON: Yeah, well how would I, I mean, I'll, will I have to be somewhere that I will have a witness or . . . ?

"TATARZYN: Don't you work a job?

"NELSON: Well. Yeah I don't have a supervisor. I'm with Jonathan but . . .

"TATARZYN: All he needs he said is two hours.

"NELSON: Hmm. How could that be uh, hmm, two hours like he'd have, like he's want to come here, or?

"TATARZYN: No, he just needs, I mean he'll talk to you. I don't know the details, cause . . .

"NELSON: Have to be worked out?

"TATARZYN: Yeah, he'll have to talk to you. [¶] . . . [¶]

"NELSON: But yeah, so a thousand bucks?

"TATARZYN: Thousand bucks."

Investigator Cornett arranged for Investigator Juan Anguiano, an under-cover officer, to pretend to be a hit man from Tijuana.

On or about July 17, 2013, Tatarzyn gave defendant Anguiano's phone number.

On July 18, 2013, Tatarzyn asked defendant if he had used the phone number; he said "No, not yet."

On July 19, 2013, defendant told Tatarzyn that he needed to figure out how to call the phone number without being traced. She let him use her phone. He placed a call, but there was no answer. Tatarzyn texted Investigator Cornett and told him the call had not gone through.

About an hour later, Anguiano phoned Tatarzyn, and she handed her phone to defendant. A recording of the call was admitted into evidence and played for the jury. In it, there was this exchange:

"UC OFFICER: Ah, who do you wish to talk to . . . ?

"NELSON: Oh, [Tatarzyn] said there's somebody that ah, who you meet me and ah, discuss some things. Maybe get some tacos.

"UC OFFICER: Oh, I, you are, you, you have ah, you have a job for me right?

"NELSON: Yes."

Defendant and Anguiano agreed to meet on Sunday at noon at the Walmart in Murrieta. Anguiano requested a photograph and an address. Defendant said he understood and added, "No problem." Anguiano asked, "Um, you're going to give me three hundred . . . ?" Defendant said, "Okay."

On July 20, 2013, defendant told his girlfriend, Vivian Levinson, "I know someone that can get rid of my wife." He said he had an appointment to meet the person the following day. She cried and "begged him not to do this." She added that "[i]f he was to proceed with it, [she] couldn't be with him anymore." Defendant replied, "That's fine. . . . I'll take care of it and stop it."

The next day, July 21, 2013, early in the morning, Levinson heard defendant sending a text message. That same day, Tatarzyn received a text from defendant saying, "Gonna pass on Guido's services. Thank you." Later, defendant told Levinson, "You saved someone's life today."

On July 22, 2013, defendant was arrested. An emergency protective order was issued and served on defendant prohibiting him from contacting Doe or his children. Nevertheless, defendant placed three calls to his home phone from jail.

Meanwhile, Investigator Cornett obtained a statement from Levinson.

On August 29, 2013, in a phone call from jail, defendant told Levinson to contact his criminal defense attorney who would "coach her on her statement." He claimed her statement was the only reason why he was still in jail. He said she should "make it right" by "reversing [her] statement."

On September 16, 2014, defendant sent Levinson a letter from jail saying, "I would be free this minute if they had not told you what to say." He added, "I don't . . . know who threatened you. I trust that you feared . . . ." He continued, "I am not judging you. . . . Please make right the statements made under duress."

## II

### THE SUFFICIENCY OF THE EVIDENCE OF SOLICITATION OF MURDER

Defendant contends that there was insufficient evidence of solicitation of murder.

With respect to solicitation of Tatarzyn, defendant argues that he only asked her to ask a hit man in Tijuana for "a two-for-one deal." Thus, he solicited her to solicit someone else to commit murder, which, he argues, is not a crime.

With respect to solicitation of Anguiano, defendant argues that it was Anguiano who solicited him, by saying, "[Y]ou have a job for me[,] right?"

We will hold that there was sufficient evidence that defendant solicited Tatarzyn. Thus, we need not decide whether there was sufficient evidence that he solicited Anguiano.

" ' "When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.] We determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citation.] In so doing, a reviewing court "presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." [Citation.]' [Citation.]" (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1104 [176 Cal.Rptr.3d 103, 331 P.3d 265].)

"Every person who, with the intent that the crime be committed, solicits another to commit or join in the commission of murder" is guilty of solicitation of murder. (Pen. Code, § 653f, subd. (b).)

■ "The essence of criminal solicitation is an attempt to *induce another to commit* a criminal offense. [Citations.] [¶] Consistent with this conception, a defendant can ordinarily be convicted under a general solicitation statute only if, had the solicitation been successful, the person solicited would have been guilty of the underlying offense." (*People v. Herman* (2002) 97 Cal.App.4th 1369, 1381–1382 [119 Cal.Rptr.2d 199], fn. omitted.)

■ A person can be guilty of a crime as a perpetrator or as an aider and abettor. (Pen. Code, § 31.) "An aider and abettor is one who acts 'with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.' [Citation.]" (*People v. Chiu* (2014) 59 Cal.4th 155, 161 [172 Cal.Rptr.3d 438, 325 P.3d 972].) Thus, a person who successfully solicits another person to commit a crime is equally guilty of that crime, as an aider and abettor. It follows that a person who solicits a second person to solicit a third person to commit a crime has essentially solicited the second person to commit the identical crime.

■ "In the usual solicitation case, it is the solicitor's intention that the criminal result be directly brought about by the person he has solicited; that is, it is his intention that the crime be committed and that. the other commit it as a principal in the first degree, as where A asks B to kill C. However, it would seem sufficient that A requested B to get involved in the scheme to kill C in any way which would establish B's complicity in the killing of C were that to occur. Thus it would be criminal for one person to solicit another to in turn solicit a third party . . . ." (2 LaFave, Substantive Criminal Law (2d ed. 2003) § 11.1(c), pp. 195–196, italics & fns. omitted.)

While we have not found any California cases on point, out-of-state cases so hold. For example, in *Commonwealth v. Wolcott* (2010) 77 Mass.App.Ct. 457 [931 N.E.2d 1025], the defendant told her cousin that she wanted her husband to " 'just disappear' " and asked if he knew someone who could help. (*Id.* at p. 458.) On appeal, she argued "that without proof of her intent that [her cousin] personally kill her husband, there can be no conviction for solicitation." (*Id.* at p. 466.) The appellate court disagreed. It explained: "There is no legal distinction between someone who commits a murder as an accessory as opposed to a principal; therefore, an individual who 'procures' a murder also 'commits' murder in the eyes of the law. [Citation.] Thus, if [the cousin] had acceded to the defendant's request and had found someone else to murder the defendant's husband, and that person had in turn personally killed her husband, [the cousin] would have been indictable for a felony. Whether the defendant solicited [the cousin] to personally kill her husband or to find another to do so is thus of no consequence. Either act constitutes a felony, and under either fact pattern, the defendant would be guilty of soliciting a felony." (*Id.* at p. 467.)

Similarly, in *Moss v. State* (Okla.Crim.App. 1994) 888 P.2d 509, the defendant argued that the evidence showed that she asked one Mr. Cravens to find someone else who would kill her husband, and that this did not constitute a crime. (*Id.* at p. 517; see *id.* at p. 513.) The appellate court held that the Oklahoma solicitation statute "cover[ed] solicitation of another to find a 'hit man.' If we were to hold otherwise, all one would have to do is place a third (or more) person in the chain and escape judgment; this does not make sense. The heart of the crime is the solicitation." (*Id.* at p. 517; accord, *Meyer v. State* (1981) 47 Md.App. 679, 686 [425 A.2d 664]; *State v. Furr* (1977) 292 N.C. 711, 720–721 [235 S.E.2d 193]; *Johnson v. State* (Tex.Crim.App. 1983) 650 S.W.2d 784, 787; *State v. Yee* (1990) 160 Wis.2d 15, 17–18 [465 N.W.2d 260].)

In his reply brief, defendant argues that he "merely asked . . . Tatarzyn to inquire about whether it would be possible to get a discount"; he did not ask Tatarzyn to inquire about actually killing his wife. Defendant forfeited this argument by failing to raise it in his opening brief. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 408 [178 Cal.Rptr.3d 185, 334 P.3d 573].) We address it anyway, because it is readily disposed of.

██ A solicitation that is made subject to a condition is criminal, even if the condition is never fulfilled. (2 LaFave, Substantive Criminal Law, *supra*, § 11.1(c), pp. 197–198.) "In all likelihood, most criminal 'solicitations,' as the word is commonly understood, carry conditional offers of various types of compensations and are probably declined by the solicited party, but solicitations they would be nonetheless. [Citation.]" (*Gardner v. State* (1979) 41

Md.App. 187, 201 [396 A.2d 303].) "The crime of solicitation . . . is completed by the solicitation itself, whether or not . . . the person solicited immediately rejects it. [Citations.]" (*In re Ryan N.* (2001) 92 Cal.App.4th 1359, 1377–1378 [112 Cal.Rptr.2d 620].)

Asking a hit man if you can have a two-for-one deal is, in essence, offering to pay him to commit murder, on the condition that he agree to do so for a discount price. The hit man may decline, but the crime of solicitation has nevertheless been committed. At a minimum, under the deferential substantial evidence standard of review, the jury could reasonably conclude that defendant was asking Tatarzyn to ask a hit man to murder his wife.

■ Defendant also argues, albeit briefly, that there was insufficient evidence that he had actually formed the intent that his wife be murdered. "Solicitation consists of the asking of another to commit one of the specified crimes with intent that the crime be committed. The intent may be inferred from the circumstances of the asking. [Citation.]" (*People v. Gordon* (1975) 47 Cal.App.3d 465, 472 [120 Cal.Rptr. 840], disapproved on other grounds in *Stark v. Superior Court* (2011) 52 Cal.4th 368, 407, fn. 15 [128 Cal.Rptr.3d 611, 257 P.3d 41].)

Here, defendant had a motive to have his wife murdered. Tatarzyn believed that defendant actually meant to harm his wife—so much so that she contacted Doe. When Tatarzyn returned from Tijuana and told defendant about her supposed conversation with the hit man, he said he was "willing to go through with it the whole way." Then when Tatarzyn put him in touch with Anguiano, defendant confirmed that he had a "job" for Anguiano. Defendant agreed to meet with Anguiano on Sunday at noon and to bring an address, a photo, and $300.

Defendant argues that, after Tatarzyn gave him Anguiano's phone number, he did not call Anguiano for two days, and then only after Tatarzyn supposedly "pressured" him. At the time, however, defendant explained that he needed to figure out how to make the call without it being traced. Defendant also points out that he did not actually go to the meeting with Anguiano. It was abundantly clear, however, that this was only because Levinson had changed his mind.

Even more to the point, "[i]n deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts. [Citation.] Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1181 [24 Cal.Rptr.3d 112, 105 P.3d 487].)

We therefore conclude that there was sufficient evidence to support defendant's conviction for solicitation of murder.[3]

### III–VI[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### VII

### DISPOSITION

Defendant's conviction for dissuading a witness (Count 4) is reversed. If the trial court had realized that it could not sentence defendant on this count, it might have made some of its other discretionary sentencing choices differently. (See generally *People v. Burbine* (2003) 106 Cal.App.4th 1250, 1256–1259 [131 Cal.Rptr.2d 628].) For example, it might have run Count 2 consecutively rather than concurrently. Accordingly, the entire sentence is reversed and the matter is remanded for resentencing.

Miller, J., and Codrington, J., concurred.

---

[3] Defendant also argues that, because solicitation of Tatarzyn was "a legally inadequate theory," and because the record does not indicate whether the verdict was based on solicitation of Tatarzyn or solicitation of Anguiano, his conviction for solicitation of murder must be reversed. As just discussed, however, we do not agree that solicitation of Tatarzyn was a legally inadequate theory.

Defendant claims that there was insufficient evidence of solicitation of Anguiano, but he does not claim that solicitation of Anguiano was a legally inadequate theory.

[*] See footnote, *ante*, page 488.