Filed 5/5/16  P. v. Howard CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E063010, E063093 |
| v. | (Super.Ct.No. RIF1401619) |
| ALBERT HOWARD III, | O P I N I O N |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Charles J. Koosed, Judge.  Affirmed.

Anthony J. Dain, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Charles C. Ragland and Teresa Torreblanca, Deputy Attorneys General, for Plaintiff and Respondent.

# I. INTRODUCTION

A jury convicted defendant and appellant, Albert Howard III, of burglary of a home owned by Michael Simms (Pen. Code, § 459, count 1)[1] and of misdemeanor vandalism (§ 594, subd. (b)(2)(A)), a lesser included offense of the charged crime of felony vandalism of Simms's home (§ 594, subd. (b)(1), count 2). Defendant claims his burglary and misdemeanor vandalism convictions must be reversed because the prosecution presented insufficient evidence he burglarized and vandalized Simms's home. He also claims the trial court erroneously refused to dismiss six of his seven prior strike convictions, all of which arose from a single incident in 1997, an armed bank robbery that involved several victims. We reject defendant's contentions and affirm the judgment.

# II. FACTUAL BACKGROUND AND VERDICT

## A. *Prosecution Evidence*

In June 2013, Simms purchased and began to renovate a home in Moreno Valley, California. At the time he purchased and began renovating the home, Simms's primary residence was in Los Angeles, California. Because of the distance between Moreno Valley and Los Angeles, Simms stayed at the home one or two nights a week while he renovated it. In August 2013, Simms kept his power tools, a bed, chairs, a portable DVD player, clothing, toiletries, a cooler, cooking utensils, and a crib for his eight-month-old

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

daughter, at the home. Simms also received mail at, and he had set up utility service for, the home.

On Thursday, August 15, 2013, Simms left the home to return to Los Angeles for the weekend. Before leaving, he closed the exterior garage door, locked all the exterior doors and windows, including the west-facing garage side door (garage side door), and he secured the windows by placing bars on the tracks of the sliding windows. There were screens on all of the windows. A sliding glass window was at the back of the home (rear window), and an east-facing sliding glass window was on the east side of the home (east-facing window). The garage side door and the east-facing window were on opposite sides of the home from each other.

The side and rear yards of the home were enclosed by fences, including a gate on the west side of the home that faced the street and opened into the west side yard (west gate). Simms testified that he always kept the west gate locked with a padlock. The garage side door was located just inside the west gate and opened into the west side yard. The west gate and the fences surrounding the rear and side yards were approximately six to eight feet in height. On the east side of the home, part of the fence ran perpendicular to the home, faced the street, and was attached to the stucco of the home (east fence).

On Monday morning, August 19, 2013, Simms returned to the home. His electrician arrived at the home between 7:45 a.m. and 8:00 a.m., and was already there when Simms arrived. The electrician informed Simms that the garage side door, located behind the padlocked west gate, was open. Simms inspected the garage side door and

3

found, based on two footprints and damage to the door frame, it had been kicked in. Simms immediately called the police, and continued to inspect the exterior of the home.

Simms discovered that the east fence had separated from, and was now leaning away from, the home's stucco wall that it was previously attached to, which he believed was because someone had "jumped over" the east fence. He also discovered that the screens of two exterior windows, both the east-facing window located just behind the damaged east fence, and the rear window, had been removed from their window frames. Simms noticed handprints on the east-facing window, which Simms described, "looked like somebody had tried to slide the window open."

Inside the home, Simms's tools had been shuffled or knocked down, his mail had been rummaged through, and a mirrored closet door in an upstairs bedroom had been shattered. Simms estimated it would cost approximately $300 to $350 in material to repair the damage caused to the garage side door that had been kicked in, $149 to $159 to replace the mirrored closet door, $75 to $85 to repair the screen for the rear window, and up to $20 in hardware to repair the east fence, located in front of the east-facing window. Simms did not know if anything had been stolen from the home.

Officer Leafy Wilson, a community service officer and nine-year veteran of the Riverside County Sheriff's Department, responded to the scene and dusted for fingerprints. Officer Wilson testified she had received training on how to dust for fingerprints, had received awards related to her fingerprinting work, and, in her nine years, she had dusted for fingerprints in hundreds of cases. Officer Wilson was able to

4

recover five usable prints from the east-facing window. She believed the prints were fresh, and no more than "several days" old, because the fingerprint powder stuck easily to the fingerprints, which, based on her background, training, and experience, was indicative of a fresh print. She acknowledged on cross-examination that she had never conducted any studies on the subject of determining the age of fingerprints.

Officer Wilson also dusted for fingerprints from the garage side door that had been kicked in, and she took photographs of the two shoe impressions from the garage side door. A fingerprint that was lifted from the garage side door did not result in any matches, and the police did not find a match for the shoe impressions. Officer Wilson did not dust for fingerprints at the rear window because she did not observe any handprints or disturbances in the dust that would have prompted her to dust for prints. She was unable to lift any fingerprints from the interior of the home.

The fingerprints lifted from the east-facing window were sent to the Cal-ID Unit of the Riverside County Sheriff's Department for processing. The Cal-ID Unit was able to process three of the fingerprints, all of which matched defendant's fingerprints.

On August 19, 2013, at 7:57 p.m., defendant was found at his mother's residence, approximately five miles from Simms's Moreno Valley home. The People also introduced evidence that, on August 19, 2013, defendant received medical treatment in Riverside for dehydration, which placed defendant in the vicinity of Moreno Valley on August 19, 2013.

B. *Defense Evidence*

Defendant testified that, in August 2013, he, his mother, his girlfriend, and his girlfriend's two children were all living in his mother's one-bedroom apartment in Moreno Valley, and that they were looking for a bigger place in Moreno Valley to rent. While driving around town, he used an application on his phone, and looked for posted signs, to identify homes in the area that were available to rent. After driving up to an available house, defendant would walk around the perimeter of the house, including the backyard, and he would look through the windows to determine whether the house was suitable for his family's needs.

Defendant did not specifically recall going to Simms's home, and he could not recall whether the home had a posted "for sale" sign, but he testified that *it was possible he had left his fingerprints on the east-facing window while looking into the interior of the home*. He testified that he did not enter Simms's home, did not kick in the west-facing garage side door or vandalize the mirrored closet door, and did not jump the east fence. He testified that, had he been at Simms's home, he would have gained entrance to the backyard through the west gate, located just outside the garage side door, but he insisted that the west gate was not padlocked, as he "don't jump the fences." He also stated that, had he been at Simms's home, he would not, and did not, remove any screens from the home's windows.

6

C. *Verdicts and Sentencing*

Following the jury trial, defendant admitted suffering seven prior strike convictions (§§ 667, subds. (c), (e)(2)(A), 1170.12, subd. (c)(2)(A)) and one prior serious felony conviction (§ 667, subd. (a)). The court struck two of four prison prior allegations, and defendant admitted the remaining two prison priors. (§ 667.5, subd. (b).) The court denied defendant's *Romero*[2] motion to dismiss six of his seven prior strikes, and sentenced defendant to 31 years to life in state prison on count 1, consisting of 25 years to life on the burglary conviction, a consecutive five-year term for the prior serious felony conviction, and a consecutive one-year term for the second prison prior. The one-year enhancement on the first prison prior was not imposed. Defendant was sentenced to a concurrent one-year term in county jail on count 2.

Defendant was also charged with being a felon in possession of a firearm on August 19, 2013. (§ 29800, subd. (a)(1), count 3.) Count 3 was severed and reassigned as count 1 under case No. RIF1403507. The other charges remained filed under case No. RIF1401619. Pursuant to a negotiated plea agreement, defendant pled guilty to being a felon in possession of a firearm and was sentenced to 16 months (one-third of the midterm of 24 months, doubled because of the prior strike). The 16-month term was imposed consecutive to defendant's 31-year-to-life sentence for the burglary conviction in case No. RIF1401619.

---

[2] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*).

7

## III. DISCUSSION

A. *Substantial Evidence Supports Defendant's Convictions for Residential Burglary and Misdemeanor Vandalism (Counts 1 & 2)*

Defendant contends the evidence was insufficient to sustain his residential burglary and misdemeanor vandalism convictions because the only evidence linking him to the charged crimes was the fingerprint evidence, as well as the fact he lived five miles from Simms's home. We conclude that substantial evidence supports the convictions.

""'"When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment . . . ." [Citation.] . . . In so doing, a reviewing court "presumes in support of the judgment the existence of every fact the trier could reasonable deduce from the evidence." [Citation.]' [Citation.]" (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1104; *People v. Nelson* (2015) 240 Cal.App.4th 488, 496.)

It is well-established that fingerprint evidence is the strongest evidence of identity, and is ordinarily sufficient, on its own, to identify the perpetrator of a crime, and to support a conviction. (*People v. Andrews* (1989) 49 Cal.3d 200, 211; *People v. Johnson* (1988) 47 Cal.3d 576, 601; *In re O.D.* (2013) 221 Cal.App.4th 1001, 1008; *People v. Tuggle* (2012) 203 Cal.App.4th 1071, 1076; *People v. Figueroa* (1992) 2 Cal.App.4th 1584, 1588; *People v. Bailes* (1982) 129 Cal.App.3d 265, 282 (*Bailes*).) Several cases have held that fingerprints left "at a point of unusual access is alone sufficient to support a burglary conviction." (*Bailes*, *supra*, at p. 282 [thumbprint on a bent bathroom window

8

screen the point of entry]; see *In re O.D.*, *supra*, at p. 1010 [palm print on an open bedroom window the point of entry].) "Moreover, '[t]he jury is entitled to draw its own inferences as to how the defendant's prints came to be on the [object] and when . . . and to weigh the evidence and opinion of the fingerprint experts.' [Citation.]" (*Bailes*, *supra*, at p. 282.)

In this case, defendant's fingerprints were found on the glass of the east-facing window, a "point of unusual access" because it was located behind the east fence, which Simms noticed was damaged and leaning towards the front of the house, as if someone had "jumped over" the fence, and because the east-facing window was located on the opposite side of the home as the garage side door that had been kicked in. (*Bailes*, *supra*, 129 Cal.App.3d at p. 282; *In re O.D.*, *supra*, 221 Cal.App.4th at p. 1010.) On August 19, 2013, the day Simms discovered that his home had been burglarized and vandalized, he noticed that the screens to both the east-facing and rear windows had been removed, even though the screens were in their window frames when he left his home on August 15, 2013. Lastly, he observed handprints on the glass of the east-facing window, "[l]ike someone was trying to push slide it open to see if it was unlocked."

In view of all the evidence presented, including defendant's own testimony, defendant's fingerprints that were lifted from the east-facing window, a point of unusual access, is substantial evidence that he committed the burglary and the misdemeanor vandalism of Simms's home. The jury could have reasonably inferred that defendant's fingerprints ended up on the east-facing window after he scaled and damaged the east

9

fence, removed the screen of the east-facing window, then placed his hands on the glass of the east-facing window in an attempt to slide it open. The jury could have also reasonably inferred that defendant then did the same with the rear window, before proceeding to kick in the garage side door, on the west side of the home, after his unsuccessful attempts to open the east-facing and rear windows. Defendant acknowledged he was looking for homes to rent in Moreno Valley between July and September 2013, and he conceded that his fingerprints may have ended up on the east-facing window when he placed his hands on them, even though defendant could not confirm whether Simms's home was even available for rent. Although Simms testified that the screens were still on the east-facing and rear windows when he left on August 15, 2013, defendant could not explain how his fingerprints ended up on the east-facing window without him removing the screen, testifying only that the screens were no longer on either the east-facing or rear windows when he placed his hands on them.

Defendant argues that the fingerprint evidence was insufficient to sustain his burglary and vandalism convictions because, unlike in *In re O.D.* and *Bailes*, the east-facing window was not broken and was not the point of entry. He further argues that "[t]here was no evidence regarding the exact time in which the fingerprints were placed on the window." Defendant also contends the People failed to "offer any additional corroborating evidence of [his] guilt," including (1) confirming that the shoe prints on the kicked-in garage side door were defendant's, (2) finding defendant's fingerprints or DNA inside Simms's home, or (3) finding stolen property in defendant's possession.

10

Defendant also points out that no eyewitnesses or video surveillance corroborated the theory that he committed the charged crimes, and he stresses the fact he did not make any incriminating statements to police.

Defendant's arguments emphasize the evidence supporting his claim that he did not commit the crimes, but disregards the substantive evidence showing he did commit the crimes. Defendant cannot prevail on an insufficiency of the evidence claim "by arguing about what evidence is *not* in the record, or by portraying the evidence that is in the record in the light most favorable to himself." (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.) "Rather, he must *affirmatively demonstrate* that the evidence is insufficient" (*ibid.*; *People v. Cardenas* (2015) 239 Cal.App.4th 220, 227), as "[a]ll conflicts in the evidence and questions of credibility are resolved in favor of the verdict, drawing every reasonable inference the jury could draw from the evidence" (*People v. Cardenas*, *supra*, at pp. 226-227). As discussed, the record in this case, including the fingerprint evidence, was sufficient to support defendant's convictions, and "'[t]he jury [was] entitled to draw its own inferences as to how the defendant's prints came to be on the [east-facing window] and when . . . and to weigh the evidence and opinion of the fingerprint experts.'" (*Bailes*, *supra*, 129 Cal.App.3d at p. 282.)

Defendant also relies on *Mikes v. Borg* (9th Cir. 1991) 947 F.2d 353, where the defendant was convicted of murder based solely on his fingerprints being found on the murder weapon, a turnstile post, but where the prosecution did not establish that the defendant's fingerprints were imprinted on the turnstile post at the time of the murder.

11

(*Id.* at pp. 355-357.) The victim in *Mikes* purchased a turnstile from a hardware store four months prior to his death. (*Id.* at p. 355.) Prior to that time, it had been in the hardware store, where it was presumably accessible to the general public. (*Id.* at pp. 358-359.) The *Mikes* court concluded that, "in fingerprint-only cases in which the prosecution's theory is based on the premise that the defendant handled certain objects *while committing the crime in question*, the record must contain sufficient evidence from which the trier of fact could reasonably infer that the fingerprints were in fact impressed at that time and not at some earlier date." (*Id.* at pp. 356-357.)

*Mikes* is distinguishable because, in that case, the fingerprints were the only evidence that implicated the defendant in the murder. The prosecution did not introduce any evidence placing the defendant at the scene of the crime at any time, and it did not establish that the defendant did not place his fingerprints on the posts and turnstile prior to the victim's purchase of the turnstile, when the turnstile was accessible to the public. (*Mikes v. Borg*, *supra*, 947 F.2d at pp. 355-359.) Here, defendant himself placed himself at Simms's home and he admitted to putting his hands on the east-facing and rear windows of the home. He could not explain how his fingerprints ended up on the glass of the east-facing window, which Simms testified was covered with a screen, and defendant could not explain how he got past the fenced-in and locked perimeter of Simms's home.

12

B.  *The Trial Court Did Not Err or Abuse Its Discretion in Denying Defendant's Romero*

*Motion to Strike Six of His Seven Prior Strikes*

Defendant contends the trial court erred when it declined to dismiss six of his seven prior strike convictions, because all seven strikes arose from a single case in 1997. In the alternative, he argues the "trial court abused its discretion under the particular circumstances of this case by denying [defendant's] *Romero* motion and instead imposing a Three Strikes Sentence on [defendant]."  We reject defendant's contentions.

1.  Defendant's Prior Strikes

All seven of defendant's prior strike convictions stem from a June 26, 1997 armed bank robbery of a Metro Commerce Bank in Upland, California.[3]  Three Black men wearing ski masks and gloves, and carrying handguns, entered the bank, as a fourth man, their getaway driver, waited outside in a stolen car.  Two of the bank robbers took cash from two of the bank's tellers, and another robber pointed a gun at two different victims, ordering both victims to lie on the floor.  After completing the robbery and making their getaway, the bank robbers abandoned the getaway car and got into two separate cars, one of which was also stolen.  The police pulled over one of the cars, where defendant was a passenger.  Defendant, who was then 19 years old, was arrested and charged as one of the perpetrators of the armed bank robbery.

---

[3]  Defendant's seven prior strike convictions arise from this court's nonpublished opinion in *People v. Collier* (Jun. 10, 2005, E033956, E034545).

13

In 2003, defendant suffered all seven of his prior strike convictions when, in connection with the 1997 armed bank robbery, he was convicted of conspiracy to commit robbery (Pen. Code, §§ 182, 211, strike 1), two convictions for robbing two bank tellers (Pen. Code, § 211, strikes 2-3), two convictions for assault with a firearm, based on one robber pointing a gun at two victims (Pen. Code, § 245, subd. (a)(1), strikes 4-5), and two auto theft convictions for stealing two different vehicles (Veh. Code, § 10851, subd. (a), strikes 6-7). In connection with strikes 2, 3, 4, and 5, an armed principal enhancement (Pen. Code, § 12022, subd. (a)(1)) was found true; however, the armed principal enhancement on strikes 4 and 5 were ultimately stricken. Gang enhancements (Pen. Code, § 186.22, subd. (b)(1)) were found true in all seven of defendant's strike convictions.

In 2003, defendant was sentenced to state prison for 13 years 4 months, but was released on parole in August 2005. He violated parole on a drug-related offense in December 2005, and was sentenced in February 2006 to prison for four years. After being released on parole in January 2008, defendant had his parole revoked in September 2008 for another drug-related offense, and he was sentenced in May 2009 to prison for five years. Defendant was released on parole in March 2013, and was arrested for the burglary and vandalism of Simms's home, as well as for being a felon in possession of a firearm, in August 2013, approximately five months after his March 2013 release on parole.

2.  Background—*Romero* Motion Hearing

At the *Romero* hearing to dismiss six of his seven prior strikes, defendant argued that all of his prior strikes were based on the same act, and that, pursuant to *People v. Vargas* (2014) 59 Cal.4th 635, the court should dismiss six of his prior strikes because he suffered all of his strikes "in the course that [*sic*] single bank robbery decision," where "[t]hese choices were all made on one day, so there was no chance to have the consequences of the first choice, the first strike, and then making a choice to have the second choice made." Relying on *Vargas*, defendant argued that "the Court could find there are [*sic*] a single course of conduct and impose it as a single strike." Defendant also noted that, after suffering his seven strikes, he did not engage in any further "violent conduct which endangered people."

The court rejected defendant's arguments, explaining that "in this particular case, I think the *Vargas* argument is not applicable, which leads essentially to the *Williams/Romero*-type reasoning that he should be someone who is found outside of the spirit of three strikes." The court found that *Vargas* was inapplicable to the facts before it because "what *Vargas* and its progeny talk about is the decision making process to commit another crime separate and apart from the crime they just committed." In defendant's armed bank robbery case, "not only was there the conspiracy, but the act of robbing the bank and the customers within the bank. Not only were people assaulted— there were two people assaulted and two people, different people, had the gun pointed at them. [¶] . . . [¶] . . . On top of that you have stolen vehicles with gang allegations."

15

"[E]ach time one of those acts is done, it looks to me as though it's a—a separate decision is made to do the act."

The court also pointed out the "underlying strikes are extremely serious behavior, bank robbery, guns, gang allegations," and it further explained that it did not think defendant's strikes were too remote in time, since defendant had been in and out of custody after serving his prison sentence for the 1997 armed bank robbery, and the court could not "say with some confidence that [defendant] has rehabilitated himself." The court also recognized that, after being released on parole in 2005, defendant twice "dodged a 25 to life sentence" when he was arrested for drug-related offenses in 2006 and 2009. Although he faced a 25-year-to-life sentence in both cases, defendant was sentenced in those two cases to only four and five years, respectively. The court also explained that, even if the two robbery and two assault with a firearm convictions (strikes 2-5) were reduced to one strike, defendant would still be subject to sentencing as a third strike offender, as he would have a second strike for the conviction of conspiracy to commit robbery, and a third strike for "the stolen car with the gang allegation" convictions. Considering defendant's prior strikes and subsequent behavior, and after explaining that "residential burglary is a serious crime, all day long," the court denied defendant's *Romero* motion.

3. Analysis

The "Three Strikes initiative, as well as the legislative act embodying its terms, was intended to restrict courts' discretion in sentencing repeat offenders." (*Romero*,

16

*supra*, 13 Cal.4th at p. 528.)  Thus, when a court is asked to dismiss prior strikes in "furtherance of justice" (§ 1385, subd. (a)), it "must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the ['Three Strikes' law's] spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*People v. Williams* (1998) 17 Cal.4th 148, 161.)

Examples of factors that a court may consider include the length of time between the commission of the prior strikes and the current crime (*People v. Bishop* (1997) 56 Cal.App.4th 1245, 1251), and whether the current or past offenses involved violence (*People v. Myers* (1999) 69 Cal.App.4th 305, 308-310).  The "defendant's sentence is also a relevant consideration when deciding whether to strike a prior conviction allegation; in fact, it is the overarching consideration because the underlying purpose of striking prior conviction allegations is the avoidance of unjust sentences." (*People v. Garcia* (1999) 20 Cal.4th 490, 500.)  Most importantly, the court must look to the defendant's conduct between the commission of the strike and the current crime.  (*People v. Williams*, *supra*, at p. 163.)  Also, a defendant who suffers multiple convictions for violent crimes arising out of a single act, but that affects multiple victims, can be deemed to have suffered multiple strikes under the Three Strikes law.  (*People v. Rusconi* (2015) 236 Cal.App.4th 273, 280-281.)

A court's failure to dismiss or strike a prior conviction allegation is subject to review under the deferential abuse of discretion standard.  (*People v. Carmony* (2004) 33 Cal.4th 367, 374.)  "'"[T]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary.  [Citation.]  In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review."'"  (*Id.* at pp. 376-377.)

Here, the trial court did not abuse its discretion in denying defendant's *Romero* motion.  As the trial court indicated, the record shows defendant did not lead a law-abiding life, even after being released on parole in 2005, approximately two years into the 13-year 4-month sentence imposed as a result of his 2003 convictions from the 1997 armed bank robbery.  Although 16 years had passed between the 1997 armed bank robbery and the 2013 burglary of Simms's home, defendant continued to violate the law during this time, serving prison sentences for drug-related offenses from 2006 to 2008 and from 2009 to 2013.  The court also determined that, even if the two robbery and two assault with a firearm convictions were reduced to one strike, defendant would still be sentenced as a third strike offender, as he would still have strikes for his convictions for conspiracy to commit robbery and auto theft, along with the gang enhancements.  Considering the nature of defendant's prior strike convictions and his current convictions, along with his conduct between the commission of the prior strike convictions and the

current crime, the trial court correctly determined that defendant did not fall outside the spirit of the Three Strikes law.

Defendant relies on *People v. Vargas*, *supra*, 59 Cal.4th 635 for the proposition that the trial court erred in "permitting a defendant to collect multiple strikes based on a single case or course of conduct," as doing so amounted to "two strikes on just one swing." (*Id.* at p. 646.) Defendant urges this court to adapt a new rule—"that a Three Strikes sentences [*sic*] is categorically barred whenever, as in this case, all of the defendant's prior strike convictions arose from a single case and a single course of conduct."

*Vargas* is distinguishable from the facts of this case. In *Vargas*, the defendant was convicted "of two different crimes (robbery and carjacking) that were based on her commission of the same act (forcibly taking the victim's car)," and the court concluded that "the trial court's failure in these circumstances to dismiss one of defendant's two prior strike convictions, and instead to treat her as a third strike offender, was inconsistent with the intent underlying both the legislative and initiative versions of the Three Strikes law." (*People v. Vargas*, *supra*, 59 Cal.4th at p. 645.) Here, and as the trial court explained, defendant's strikes were not based on the commission of the same act. The trial court noted that, unlike *Vargas*, it could not "see how the multiple strikes [defendant] was convicted of were all done by one act. There were several acts done by [defendant] which led to each and every strike conviction," and it explained that "each

time one of those acts is done, it looks to me as though it's a—a separate decision is made to do the act."

Defendant's *Romero* motion was properly denied.

## IV.  DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ

P. J.

We concur:

HOLLENHORST

J.

McKINSTER

J.